U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUN 1 5 2018
CLERK, U.S. DISTRICT COURT
By _____
     Deputy

# United States District Court

NORTHERN DISTRICT OF _____

UNITED STATES OF AMERICA

V.

CHRISTOPHER A. FAULKNER

COMPLAINT
3-18MJ407-BT
CASE NUMBER: 3-18-MJ-

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning by at least by 2011 and continuing through April 2016, in the Northern District of Texas and elsewhere, the defendant did:

in connection with offer and sale of securities, that is, fractionalized working interests in the oil-and-gas prospects, knowingly and willfully, by the use of transportation and communication in interstate commerce, and by the use of the mails and commercial interstate carriers, employed a scheme and artifice to defraud, and obtained money by means of untrue statements of material facts and the omission of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading,

in violation of Title 15, United States Code, Sections 77q(a) and 77x, and Title 18, United States Code, Sections 1341, 1957, and 2.

I further state that I am Special Agent with the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

See attached Affidavit of Special Agent James R. Bridges (FBI) which is incorporated and made a part hereof by reference.

Continued on the attached sheet and made a part hereof:   XX Yes   No

_____
Signature of Complainant
James R. Bridges
Special Agent, (FBI)

Sworn to before me and subscribed in my presence, on this 15th day of June, 2018, at Dallas, Texas.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent James R. Bridges, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2003.

I am a graduate of the University of Arkansas – Fayetteville, where I received a Bachelor of Science in Electrical Engineering in 1995. I am currently assigned to a complex financial crimes squad in the Dallas field office of the FBI. My primary responsibilities as a Special Agent include the investigation of alleged fraud schemes which often lead to charges for Wire Fraud (18 U.S.C. § 1343), Mail Fraud (18 U.S.C. § 1341), and Money Laundering (18 U.S.C. § 1956 and 1957). In carrying out my investigative duties, I have investigated a number of white collar crimes, including money laundering, wire fraud, mail fraud, bankruptcy fraud, and other financial crimes. I have participated in the drafting and execution of warrants to search for evidence of financial crimes. I have also participated in debriefing defendants, witnesses, informants, and other persons who have knowledge of felony offenses under both state and federal law.

During my employment with the FBI, I have received training and gained experience in analyzing personal financial records and business records and in analyzing both legal and illegal businesses and activities.

## PURPOSE OF AFFIDAVIT

This affidavit provides probable cause to believe that Christopher A. Faulkner ("Faulkner"), from at least 2011 through April 2016, acting by and through entities he formed and controlled, perpetrated an investment fraud scheme that involved the offer and sale of fractionalized working interests in a number of oil-and-gas prospects. There is cause to believe that Faulkner misrepresented to investors material facts to prospective and participating investors and omitted material information in violation of violation of 15 U.S.C. §§ 77q(a) and 77x, (Securities Fraud) and 18 U.S.C. §§ 1341 and 2 (Mail Fraud and Aiding and Abetting), and further engaged in monetary transactions in property derived from criminal activity exceeding the amount of $10,000 in violation of 18 U.S.C. §§1957 and 2 (Money Laundering and Aiding and Abetting).

15 U.S.C. §§ 77q(a) provides it is a criminal offense for any person, in connection with the offer or sale of securities, to willfully and with intent to defraud, and by the use of the mails, or any means or instruments of transportation or communication in interstate commerce, do any one of the following:

(1) employ a device, scheme or artifice to defraud, or

(2) obtain money or property by means of untrue statements of material facts or failure to state material facts that made what was said, under the circumstances, misleading, or

(3) engage in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchase.

18 U.S.C. § 1341 provides it is a criminal offense for any person to knowingly and acting with a specific intent to defraud, to create a scheme to defraud, and to mail or cause

another person to mail something through the United States Postal Service or a private or commercial interstate carrier for the purpose of carrying out the scheme.

18 U.S.C. §1957 provides it is a criminal offense for a person to knowingly engage in a monetary transaction of a value greater than $10,000 that involved criminally derived property from a specified unlawful activity, when the person knew that the transaction involved criminally derived property. The offenses of Securities Fraud and Mail Fraud are specified unlawful activities. 18 U.S.C § 1956 (c)(7)(A) and 1961(1)(B) and (D).

The facts set forth in this affidavit are based upon my personal investigation, my training and experience, and information obtained from multiple law enforcement personnel, witnesses, and the persons and parties identified in this affidavit. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.

## BACKGROUND OF THE INVESTIGATION

In December 2012, the Securities and Exchange Commission ("SEC") initiated a civil investigation, focusing on the activities of Faulkner and his entities. During the course of its investigation, the SEC obtained a significant amount of information and records, including emails, financial records, third party business records, and deposition testimony of multiple witnesses and Breitling employees. SEC financial analysts have also conducted extensive analysis of over 100 bank accounts related to Faulkner's entities. On June 24, 2016, the SEC filed a civil complaint against Faulkner and others alleging multiple violations of the Securities Act, 15 U.S.S. § 77q(a). See, *SEC v. Christopher A. Faulkner, et. al.*, 3:16-cv-1735-D (N.D.–Tex). On August 10, 2017, the SEC filed for and obtained a

TRO, asset freeze and the appointment of a receiver over the assets of Breitling. (3:16-cv-1735-D. Dkt 99, 107 – 110).

In July of 2015, the Internal Revenue Service – Criminal Investigation ("IRS-CI") and the FBI initiated a criminal investigation. Much of the information obtained by the SEC during its investigation was shared with the criminal investigators. On April 28, 2016, the FBI and IRS-CI executed search warrants and seized a substantial amount of documents and electronic data from Breitling, Crude and Patriot's offices located at 1910 Pacific Avenue, Dallas, Texas.

In 2016, the SEC retained Veritas Advisory Group, Inc. ("Veritas") to review and analyze financial information and transactions relating to Faulkner's companies. Subsequently, both the court appointed receiver and the United States Attorney for the Northern District of Texas retained Veritas to assist in their efforts.

The SEC provided Veritas tens of thousands of pages of information including bank statements and American Express records. On August 7, 2017, the SEC filed a 69 page Expert Report prepared by Veritas under the signature of Rodney Sowards in support of its application for the TRO, asset freeze and appointment of a receiver. (3:16-cv-1735-D, Dkt. 105-11). In the report, Veritas arrived at a number of conclusions, some of which are cited in this affidavit.

## STATEMENT OF PROBABLE CAUSE

### Faulkner's Companies and Role

Between 2009 and April 2016, Faulkner established and controlled several oil and gas companies through which he acquired and then sold to private investors working and

royalty interests in oil and gas prospects located primarily in Texas, Oklahoma, Kansas, and North Dakota. In 2009, Faulkner and Parker Hallam, Michael Miller, formed Breitling Oil and Gas Inc., ("Breitling"). Breitling maintained offices and conducted business since 2013 at 1910 Pacific Avenue, Dallas, Texas. Prior to 2013, Breitling's office was in Irving, Texas. Between January of 2011 and December 2013 Breitling sold at least fifteen working interest programs to investors throughout the United States. Hallam and Miller managed the sales persons and personally conducted sales.

According to interviews of multiple witnesses, including Hallam, Miller, other Breitling employees and third parties, Faulkner exclusively directed and controlled the business and financial activities of Breitling. Faulkner negotiated and acquired the oil and gas interests to be sold. He exercised control and directed the preparation of the marketing materials. Faulkner was a signatory of all Breitling bank accounts and directed the payment and flow of funds received from investors. And, as described below he was the primary beneficiary of millions of dollars of misappropriated investor money.

In 2013, Faulkner transitioned Breitling into a public company through a reverse merger with an existing publicly listed company. The reverse merger created Breitling Energy Corporation ("BEC") with the defendant as the chairman of the board.

At the same time of the reverse merger, Faulkner moved the marketing efforts conducted by Breitling to another of his shell companies by changing the name of an LLC to Crude Energy, LLC ("Crude"). Hallam and Miller were designated and advertised as Crude's officers. Crude assumed the marketing activities of Breitling after the reverse merger. From in or about December 2013 to March 2015, Crude sold to investors an

additional five working interest programs. Crude also maintained its offices at 1910 Pacific Avenue in Dallas, Texas.

In March 2015, Hallam terminated his relationship with Faulkner. Faulkner then changed the name of an existing corporate entity to Patriot Energy, Inc. ("Patriot') with Miller as the President.

Although, Faulkner was not identified as an officer or owner of either Crude or Patriot, he continued to exercise the same degree of control over these companies as he had for Breitling.

## The Marketing of the Working Interest Investments

Breitling, Crude, and Patriot (hereafter referred to collectively as "Faulkner's companies") offered and sold to investors a "unit" of the working interest in a proposed well. These units were undivided fractional interests in oil and gas rights and are therefore securities, as that term is defined in the securities laws of the United States. 15 U.S.C. § 77b(1).

Faulkner's companies all marketed these working interest units in a similar manner. Faulkner testified at his deposition, taken by the SEC, that potential investors were identified either from a lead generation company in Florida or from inquiries from its company website. A sales person would conduct a pre-sales check with a potential investor to determine whether their qualifications as an accredited investor under SEC regulations were met. If accredited and interested, the prospective investor would then be handed off to Hallam or Miller to make the sale. In dealing with the prospective investors, the sales

personnel communicated from Texas via phone and email to prospective investors across the United States.

As a part of the sales process, offering documents were delivered to the potential investor by Federal Express ("FedEx"). These offering documents consisted of a marketing brochure, a Confidential Information Memorandum ("CIM"), and subscription documents describing the particular oil and gas investment prospect which also included instructions on how to provide investment funds. Included with the offering documents was a self-addressed, FedEx mailer for the potential investor to return the signed subscription documents and the investor's payment. Investors returned this FedEx mailer, including the signed subscription documents and payment, to Faulkner's office located in the Northern District of Texas.

According to the offering documents, the price for each unit was based on a proportional share of the estimated costs to drill and complete the well. These units were offered on what was described as a "turnkey" basis. Under this turnkey arrangement the investor's investment was fixed, in that, should the actual costs of drilling the well exceed that estimated, then the company would be responsible for the overage, not the investor.

The estimated costs to drill and complete the well was provided to the investor in the form of an itemized list of the expected costs known as an Authority for Expenditure ("AFE"). An AFE is generally prepared by the well operator with the requisite knowledge and experience to estimate the costs. These AFEs were attached as an exhibit in the CIM.

The offering materials also represented that investor funds would be deposited into a segregated bank account and all costs for the drilling and completion of the well would be

paid from that account. Investors were also told that the defendant's companies would receive compensation only after a well was successfully drilled. According to the offering materials, this would occur in two ways: (1) in the event the actual costs of the drilling and completion were less than the estimated costs then the excess funds received by the company from investors could be retained by the company, and (2) if the proceeds from the well production were sufficient that each investor received one hundred percent return of their investment, then the company would begin to receive a percentage of production revenue otherwise due to the investor. This second method of compensation was known as the "back-in after payout" or "BIAP."

The marketing brochure described the prospect and included a Geology Report prepared by Joe Simo ("Simo") of Simo Energy LLC, who appeared to be an independent geologist. Simo often provided in his Geology Report an estimate of the future production from the well. The color brochure also included a "Monthly Gross Income Conversion Table" which informed the prospective investor of expected monthly income based on the estimated production figures. Faulkner's sales persons heavily emphasized the income conversion tables to the prospective investors.

The Scheme to Defraud

The investigation has disclosed multiple forms of fraudulent misrepresentations made to investors in the marketing of working interest units. These include: (1) the hyper-inflation of the supposed "reasonably estimated" costs to drill, test, and complete the wells contained in the AFEs which resulted in large undisclosed profits to the defendant's companies; (2) the inflated reports and production estimates supplied by a supposed third

party geologist; (3) the over sale of units to investors; and (4) the diversion of substantial investor funds for purposes other than represented, with much of it going to Faulkner's personal benefit.

## AFE Fraud

Well operators for each of Faulkner's prospects created AFEs in preparing to drill and complete the wells and provided these to Faulkner. However, these AFEs were never included in the offering materials provided to investors. Emails obtained from the SEC and examination of Faulkner's computer seized from his office showed he commonly created AFEs in the name of the operator, but grossly inflated estimated costs.

For example, in regard to a prospect called the Nighthawk that was marketed by Breitling, Breitling received an AFE from the well operator for $2,645,075 dated October 1, 2013. Faulkner created his own AFE for the Nighthawk dated the same day, with line items totaling $25 million, approximately 10 times greater than the operator's AFE. The inflated AFE was attached to CIM for Nighthawk and distributed to investors.

In regard to another prospect the Goodbird #1H, one line of item of Faulkner's AFE particularly stands out. According the SEC's investigation, on December 7, 2011, Faulkner agreed to acquire 10% of the existing acreage from the operator, D&J Oil, for $148,000. Faulkner listed the "estimated" cost for "Acreage, Geophysical, Geological" in the May 1, 2012 Goodbird AFE at $4,947,645, an inflation of more than 33 times the actual cost.

Faulkner consistently overstated the AFE estimated costs in all the working interest programs his companies sold to investors. Among the working interest programs Faulkner inflated were the following:

| OFFERING | DATE OF OFFERING | OPERATOR AFE | FAULKNER AFE | % INFLATED |
|---|---|---|---|---|
| Breitling Goodbird #1H | 05/01/2012 | $3,000,000 | $25,000,000 | 833% |
| Breitling – Pumpkin Ridge 2 | 08/01/2012 | $24,637,898 | $41,579,824 | 169% |
| Breitling – Big Horn 2 | 11/01/2012 | $17,425,905 | $41,579,824 | 239% |
| Arbuckle/Nighthawk | 04/01/2013 | $2,645,075 | $25,000,000 | 945% |
| Breitling – Eagle Eye #1H | 10/01/2013 | $10,192,625 | $41,549,000 | 410% |
| Crude – Red Wolf #1 | 03/01/2014 | $1,843,350 | $8,000,000 | 434% |
| Crude – White Wolf #1 | 07/01/2014 | $1,899,700 | $8,000,000 | 421% |
| Crude – Blue Wolf #1 | 10/15/2014 | $1,772,050 | $8,000,000 | 451% |

By grossly inflating the estimated costs in the AFEs, Faulkner ensured huge profits for his companies because there was no possibility that the actual costs of the well would ever approach the grossly inflated estimates represented to the investors.

<u>Inflated Production Estimates</u>

The offering materials for Breitling stated, "Breitling Oil and Gas Corporation relies upon the Dallas-based firm of Simo Energy, LLC and its principal, Simo, for their expertise in petroleum geology." Faulkner made it appear that Simo was an independent third-party providing geology services on an objective basis. However, Simo was closely affiliated with Breitling. In fact, Simo and Faulkner specifically discussed making the reports appear as if Simo was an independent third-party as stated in an email from Simo to Faulkner dated March 15, 2010:

> From: <jsimo@simoenergy.com>
> Date: Mon, 15 Mar 2010 11:23:06 -0700
> To: Chris Faulkner<mobilecf@constellate.com>; Chris [Breitling<chris@breitlingoilandgas.com>
> Subject: Pages 1 & 2
>
> Here are pages 1 & 2. Page 2 has been changed, numbers, gross income, production etc.
>
> Page 3 I'm leaving alone. For a "new" page 4 I'm writing a general geology report describing your exhibits. All other pages will have to be re-numbered.
>
> What do you think of me writing my report as a "third party" as we've discussed? I'll use my letterhead and you can insert in the book.
>
> Joe Simo, CPG
> SimoEnergy
> 3512 Sage Brush Trail
> Plano, TX 75023
> 214.537.4723
> www.simoenergy.com

Within most of the offering materials, Faulkner's companies included a "Monthly Income Oil and Gas Income Conversion" table to provide investors with a projected return based on a given investment. These tables were based on projections made by Simo about how each prospect was expected to perform. The offering materials failed to disclose that Faulkner's programs had a consistent pattern of over-estimating initial oil production.

The SEC provided the following chart based on their review of preliminary production figures:

| BREITLING OFFERING | SIMO ESTIMATED PRODUCTION | ACTUAL PRODUCTION |
|---|---|---|
| Davenport #1 | 250 BOPD | 0 BOPD |
| Woodring #1 | 220,000 BO over life of well | 2 BOPD |
| Big Tex 3 Well | 300 BOPD | 20 BOPD |
| Buffalo Run #1H | 850 BOPD | 307 BOPD |
| Golden Ridge 2 Well | 700 BOPD | 141 BOPD |
| Warrior | 350 BOPD | 57 BOPD |
| Big Caesar 2 Well | 2,200 BOPD | 352 BOPD |
| Big Caesar #1H | 5,000 BOPD | 806 BOPD |
| Goodbird #1H | 2,000 BOPD | 88 BOPD |
| Pumpkin Ridge 2 Well | 1,000 to 3,000 BOPD | 215 BOPD |
| Bighorn 2 Well | 1,000 to 3,000 BOPD | 265 BOPD |

Moreover, an examination of Faulkner's computer and review of emails demonstrated Faulkner often increased Simo's already inflated estimates. For example, in regard to the Big Horn 2 program, on November 12, 2012, Simo provided Faulkner by email with initial production projections of 1,000 to 3,000 BOPD.[1] Faulkner replied back to Simo on November 15, 2012, that the report looked great and he had no changes. However, Faulkner then sent an altered report to the company printing Breitling's offering materials with inflated projections of 5,000 to 7,000 BOPD.

On July 12, 2012, Simo created a report for the Pumpkin Ridge which was directed to Faulkner that projected initial production rates "between 1,000 and 3,000 BOPD." That same day, Faulkner modified Simo's report increasing initial production rates to "between 2,000 and 4,000 BOPD." Faulkner then sent an email to the designer of the Pumpkin Ridge color brochure with Simo's report, but with the inflated figures of 2,000 to 4,000 BOPD.

### Oversold Offerings

An examination of the bank accounts of Faulkner's companies below demonstrated that Faulkner consistently sold more units to investors than the program had for sale. According to Hallam, he was instructed by Faulkner that there were some "Units in reserve" that he could sell; however, this was not the case. Mathematically, there can be no extra units when the total price is divided by the number of interests offered to determine the price per unit.

The following chart shows that during 2011 to 2013 Breitling over-sold investments in the amount of $8,797,207. ($44,461,707 minus $35,664,500).

---

[1] BOPD represents barrels of oil per day.

| BREITLING OFFERING | DATE OF OFFERING | UNITS OFFERED | TURNKEY UNIT PRICE | TOTAL BREITLING OFFERING | AMOUNT RAISED |
|---|---|---|---|---|---|
| Woodring #1 | 01/01/2011 | 12 units | $109,155 | $1,319,700 | $2,094,260 |
| Big Tex 3 Well | 05/04/2011 | 10 units | $115,000 | $1,150,000 | $1,910,709 |
| Buffalo Run #1H | 06/20/2011 | 10 units | $210,000 | $2,100,000 | $1,927,497 |
| Golden Ridge 2 Well | 08/25/2011 | 12 units | $258,000 | $3,096,000 | $2,609,605 |
| Big Caesar 2 Well | 12/01/2011 | 10 units | $410,000 | $4,100,000 | $6,597,679 |
| Big Caesar #1H | 05/01/2012 | 10 units | $205,000 | $2,050,000 | $2,763,244 |
| Goodbird #1H | 05/01/2012 | 10 units | $250,000 | $2,500,000 | $3,517,563 |
| Pumpkin Ridge 2 Well | 08/01/2012 | 10 units | $410,000 | $4,100,000 | $6,139,500 |
| Bighorn 2 Well | 11/01/2012 | 10 units | $410,000 | $4,100,000 | $5,278,125 |
| Arbuckle #1H | 04/01/2013 | 10 units | $250,000 | $2,500,000 | $4,511,005 |
| Eagle Eye #1H | 08/15/2013 | 10 units | $250,000 | $2,500,000 | $3,059,375 |
| Nighthawk | 10/01/2013 | 10 units | $200,000 | $2,000,000 | $3,238,385 |
| | | | TOTAL | $35,664,500 | $44,461,707 |

The following chart shows oversold investments by Crude and Patriot during 2014 and 2015. The table shows a total of oversold investments of $8,256,622 ($22,256,622 minus $14,000,000.

| OFFERING (Crude or Patriot) | DATE OF OFFERING | UNITS OFFERED | TURNKEY UNIT PRICE | TOTAL OFFERING AMOUNT | AMOUNT RAISED |
|---|---|---|---|---|---|
| Red Wolf (Crude) | 03/01/2014 | 50 units | $80,000 | $4,000,000 | $5,950,030 |
| White Wolf (Crude) | 07/01/2014 | 25 units | $80,000 | $2,000,000 | $6,870,000 |
| Blue Wolf (Crude/Patriot) | 10/15/2014 | 50 units | $80,000 | $4,000,000 | $4,279,002 |
| Thoroughbred (Patriot) | 03/01/2015 | 50 units | $80,000 | $4,000,000 | $5,157,590 |
| | | | TOTAL | $14,000,000 | $22,256,622 |

## Diversion and Misappropriation of Investor Funds

For each of the offerings, Faulkner established a bank account in the program's name that received the investor funds. The offering materials represented to investors that their funds "will be deposited into a segregated account" and "all payments for Drilling, Testing Costs and Completion and Equipment Costs shall be paid from the segregated account." Veritas's analysis of the bank accounts established Faulkner's companies violated the provisions in its CIMs by commingling investor funds in at least three distinct ways: (i) transferring substantially all of the investor funds from the segregated accounts into its general and operating bank accounts before making any payments for drilling and testing; (ii) depositing investor funds directly into general and operating bank accounts, and (iii) depositing at least (remove approximately or at least) $1.5 million of investor funds earmarked for one prospect into the segregated offering account set up for a different prospect.

Faulkner diverted significant amounts of investor funds to his own benefit while investors received minimal returns on their investment. Veritas's report determined that during the operation of Breitling between 2011 and 2013, Breitling received investments totaling approximately $41.4 million; however, the investors only received less than $2.4 million of their initial investment. Faulkner, during this same time period, received approximately $8 million in cash disbursements from Breitling. In addition to these direct cash payments, Faulkner received at least $1.9 million of additional benefits by virtue of Breitling paying for apparent personal expenses on credit cards on which he was an authorized user or account owner. Furthermore, Breitling expended more than $2 million of

investor funds on apparent personal expenses for Faulkner in direct charges to its bank accounts.

According to Veritas's report, in 2014 and 2015 Crude and Patriot raised $30.5 million from investors in working interest programs and an additional $24.5 million for royalty interest programs. Investors received only $3.8 million in distributions related to their investments in the working interest offerings. In comparison, Faulkner diverted $13.8 million of commingled investor funds by means of $6.1 million in cash disbursements and approximately $7.7 million in personal American Express card charges. In addition, the companies also paid more than $4 million in apparent personal expenses through its bank accounts.

Faulkner used investor money to finance a lavish lifestyle. For example, the SEC financial analyst identified the following expenses were either charged to an American Express card or reimbursed to Faulkner for the year 2014.

| CATEGORY/VENDOR | AMOUNT |
| --- | --- |
| Status Luxury Group – Private Entertainment | Over $780,000 |
| In the Know Experience – Travel/Lifestyle Company | Over $380,000 |
| Amazon.com | Over $100,000 |
| Private Limousine Services | Over $67,000 |
| Private Jet Carriers | Over $220,000 |
| Lavo – New York Nightclub | Over $100,000 |
| Provocateur – New York Nightclub | Over $50,000 |
| Tao – New York Nightclub | Over $28,000 |
| Box Soho – London Burlesque Club | Over $24,000 |
| Trunk Club – Men's Clothier | Over $47,000 |
| Custom Clothes Tailor – Hong Kong | Over $23,000 |

Faulkner also funneled investor funds through several external accounts to acquire personal assets. Veritas determined that several million dollars was transferred from Breitling, Crude, and Patriot accounts to accounts established by Faulkner in the names of Grand Mesa Investments, Inc., Advertising Management Inc., and Range Quest Resources, among others. Agents interviewed Beth Hankins who worked as administrative assistant for Faulkner for several years. Handkins told investigators that she was instructed by Faulkner to make the transfers to these accounts for what Faulkner described as reimbursement for his expenses. Handkins acknowledged that these companies had no business dealings with Breitling, Crude or Patriot. A financial analysis conducted by IRS-CI of these external accounts established that Faulkner engaged in a number of financial transactions exceeding $10,000 to acquire multiple high end vehicles, expensive jewelry, clothing, art, home improvements, professional concierge services, and chartered flights.

[NOTHING FURTHER ON THIS PAGE].

## CONCLUSION

I submit that this Affidavit establishes probable cause that Faulkner has committed Securities Fraud in violation of 15 U.S.C. §§ 77q(a) and 77x, Mail Fraud, Money Laundering and Aiding and Abetting in violation of 18 U.S.C. §§ 1341, 1957 and 2.

Respectfully submitted,

*[signature]*

James R. Bridges
Federal Bureau of Investigation

Subscribed and sworn to before me on June 15, 2018:

*[signature]*

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE