UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:18-CR-0500-B |
| | § | |
| CHRISTOPHER AUNDRE | § | |
| FAULKNER, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant Christopher A. Faulkner's Motion to Reconsider and Revoke the Pretrial Detention of Defendant (Doc. 90). Faulkner moves the Court to reconsider and revoke his pretrial detention for two reasons: (1) changed circumstances render the grounds for his detention moot; and (2) his continued detention violates due process. For the reasons that follow, Faulkner's motion (Doc. 90) is **DENIED**.

## I.

## BACKGROUND

The twenty-one count superseding indictment in this case charges Faulkner with six counts of securities fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x; seven counts of mail fraud, in violation of 18 U.S.C. § 1341; six counts of engaging in illegal monetary transactions, in violation of 18 U.S.C. § 1957; and two counts of attempting to evade and defeat tax, in violation of 26 U.S.C. § 7201. Doc. 72, Superseding Indictment. The Government alleges that these charges stem from a seven-year fraudulent oil and gas investment scheme in which Faulkner purported to sell working

- 1 -

interests to investors. Faulkner allegedly underpaid these investors' returns and obtained these funds for his own use.

On June 18, 2018, Faulkner was arrested on a criminal complaint at the Los Angeles International Airport ("LAX") as he attempted to board a flight to London Heathrow. Doc. 20, Detention Order, 4. At the time of his arrest, he was carrying 10 one-ounce gold bars, gold coins, $10,726.00 in cash, two brand-new cell phones, and his birth certificate. *Id.* The Government alleged that Faulkner was attempting to flee the United States for Lebanon. Doc. 7, Br. in Supp. of Gov't's Mot. for Detention, 2. The Government moved for pretrial detention of Faulkner on the basis that he was preparing to flee the United States to avoid prosecution and that he posed a serious risk of flight. *Id.* at 1.

On July 12 and 16, 2018, United States Magistrate Judge Renée Harris Toliver held a hearing on the Government's motion. Doc. 20, Detention Order, 2. At the hearing, Judge Toliver heard testimony from three special agents as witnesses for the Government, and a private investigator as a witness for Faulkner. *Id.* at 2–3.

One special agent testified that in October 2017, the Government had learned through a confidential source that Carole Faulkner, Faulkner's mother and former attorney, was working with a person named "Bennie" in Lebanon to secure living arrangements for Faulkner. *Id.* at 2–3. The agent testified that Carole traveled to Lebanon in April 2018, and that she was still in Lebanon at the time of the hearing. *Id.* at 3. The agent also testified that Carole's Colleyville, Texas house was listed for sale and that Bennie was helping Carole sell the house. *Id.*

The Government's other witnesses testified that later, on May 2, 2018, the Government met with Faulkner's counsel for a reverse proffer to preview the Government's case against Faulkner.

- 2 -

*Id.* At this meeting, the Government explained that Faulkner could face a life sentence. *Id.* Faulkner was not present at the meeting because he was vacationing in Mexico, but he returned to the United States on May 5, 2018. On May 16, 2018, Bennie sent a message to the Government's confidential source via WhatsApp, asking if there were any arrest warrants or flight-risk alerts on Faulkner. *Id.* On June 4, 2018, the Government gave Faulkner a plea offer, which included a term of imprisonment. *Id.* at 4. On June 14, 2018, the Government learned that Faulkner had booked a round-trip ticket to London, departing on June 18. *Id.* Then, on June 15, 2018, the Government filed a criminal complaint, *see* Doc. 1, and obtained an arrest warrant. Doc. 20, Detention Order, 4. On the day of his departure, Faulkner was arrested at LAX with the money, gold, phones, and birth certificate, as described above. *Id.*

Judge Toliver heard testimony from Faulkner's witness, a private investigator, that Faulkner was leaving the United States for a business meeting in London. *Id.* The investigator testified that Faulkner planned to return to the United States after his meeting based on the return ticket he purchased. *Id.* The investigator also testified that Faulkner was not a flight risk because he was in Mexico when he learned of the Government's charges through the reverse proffer, yet he returned to the United States shortly thereafter. *Id.*

After hearing this testimony and considering the 18 U.S.C. § 3142(g) flight-risk factors, Judge Toliver concluded that the Government had shown by a preponderance of the evidence that no condition or combination of conditions of release would reasonably assure Faulkner's appearance as required. Doc. 15, Judge Toliver's Order of Detention, 2–3. Judge Toliver based her decision on, amongst other things, the lengthy period of incarceration that Faulkner faced if convicted and Faulkner's significant family or other ties outside the United States. *Id.* Judge Toliver also credited

the Government's evidence that Faulkner had made plans to leave the country for Lebanon, likely with the intent to avoid prosecution. *Id.* at 3. Judge Toliver found that the timing and circumstances of his arrest were "suspicious" based on the items he had with him. *Id.* She also found it significant that Faulkner "was essentially 'living off the grid,' in the United States, in that he has no residential ownership or residential lease in his own name, no personal bank accounts, and no property of any significance that he has not already been, or is [in] the process of, being liquidated." *Id.* Judge Toliver noted there was evidence that Faulkner was, with "his mother/co-conspirator," amassing assets overseas in Lebanon in the months before his arrest. *Id.* As for Faulkner's witness, Judge Toliver found "less-than-credible the hearsay statements of Defendant's spouse and mother, as recounted by" the private investigator. *Id.*

Finally, Judge Toliver noted that Faulkner had a "history of failing to abide by rules of court as evidenced by District Judge Fitzwater's contempt finding against him and the sanctions imposed against him by Magistrate Judge Horan for manipulating digital evidence in a related civil action: SEC v. Faulkner, No. 3:16-CV-1735-D." *Id.*

After Judge Toliver issued her order of detention, Faulkner moved to revoke that order under 18 U.S.C. § 3145(b) and to be released on conditions while awaiting trial. Doc. 18, Mot. to Revoke. Judge Fitzwater conducted a *de novo* review of the evidence presented at the detention hearing, and denied Faulkner's motion. Doc. 20, Detention Order, 1. Judge Fitzwater likewise found that the Government had proved by a preponderance of the evidence that no condition or combination of conditions would reasonably assure Faulkner's appearance as required. *Id.* at 6. He also found that the "totality of the § 3142(g) factors demonstrate that Faulkner is a flight risk." *Id.*

Faulkner then sought an interlocutory appeal of Judge Fitzwater's order. Doc. 21, Notice of

- 4 -

Appeal. Applying a deferential review standard equivalent to the abuse-of-discretion standard, the Fifth Circuit held that "the evidence as a whole supports the conclusions of the proceedings." Faulkner appealed the detention order, and the Fifth Circuit affirmed. *See United States v. Faulkner*, 744 F. App'x 861 (5th Cir. 2018)(quoting *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992)).

Starting in July of 2018, Faulkner and the Government started to engage in plea negotiations. Doc. 92, Gov't's Resp., 5. On July 20, 2018, pursuant to these discussions, the parties filed a joint motion requesting that the Court continue the time to indict until September 15, 2018. Doc. 16, Joint Mot. to Continue, 2. Magistrate Judge Rutherford granted the motion that same day. Doc. 17, Order. On September 5, 2018, the parties filed a second motion to continue the time to indict until October 13, 2018. Doc. 25, Second Joint Mot. to Continue. In the motion, signed by both Faulkner and his counsel, the parties represented that they were "engaged in plea negotiations which could negate the need for an indictment and avoid the unnecessary expenditure of resources by both the judiciary and the parties. Because of the complexity of the issues to be resolved both parties believe that this additional time is necessary to reach an agreement." *Id.* at 2. In connection with this motion, Faulkner and his counsel executed a "Statute of Limitations Waiver," whereby Faulkner acknowledged that any delay in indictment was at his request and waived any defenses he may have had under Rule 48(b) or the Sixth Amendment. Doc. 92-2, Statute of Limitations Waiver (Ex. 2).

Subsequently, on October 4, 2018, the parties entered into a plea agreement. Doc. 32, Plea Agreement. Faulkner pleaded guilty to a three-count Information for securities fraud, illegal monetary transactions, and tax evasion. *Id.* at 1–2. Pursuant to Rule 11(c)(1)(C), the parties agreed that an appropriate term of imprisonment for this case would be 144 months. *Id.* at 2. On October

23, 2018, Faulkner entered his plea of guilty to the Information before Judge Toliver. Doc. 36. On November 26, 2018, the Court entered an order accepting the guilty plea and adjudging Faulkner guilty of the offenses charged in the Information. Doc. 41, Order Accepting Guilty Plea.

The Court held Faulkner's sentencing hearing on March 21, 2019. Doc. 54. At the hearing, the Court informed the parties that it was rejecting the plea agreement. The Court gave Faulkner two weeks from the date of the hearing to decide whether to withdraw his guilty plea. *Id.* On April 15, 2019, Faulkner filed his unopposed motion to withdraw his plea, which the Court granted on April 21, 2019. Doc. 59, Faulkner's Mot.; Doc. 61, Order.

On May 29, 2019, the Government filed a twenty-one count indictment against Faulkner that superseded the October 2018 Information. Doc. 72, Superseding Indictment. The Court then issued an amended scheduling order, setting trial for August 8, 2019. Doc. 75, Scheduling Order. On June 19, 2019, Faulkner filed an unopposed motion requesting that the Court appoint the Federal Public Defender ("FPD") as coordinating discovery attorney because of the "voluminous discovery" related to this case. Doc. 76, Mot. to Appoint, 3. The motion was granted on June 21, 2019. Doc. 78, Order. Shortly thereafter, on June 22, the parties filed a joint motion to continue the trial setting and to designate the case as complex under 18 U.S.C. § 3161(h)(7)(B)(ii). Doc. 79, Joint Mot. The parties represented that the case was complex due to "the nature of the prosecution, the complexity of the facts underlying the indictment, and the voluminous nature of the discovery." *Id.* at 1–2. The parties asked the Court to grant an "ends of justice" continuance on the basis that it outweighed "the best interests of the public and the defendant in a speedy trial." *Id.* at 1. The parties recommended that the Court schedule a status conference "in approximately 6 months for the parties to advise the Court as to the status of discovery, outstanding issues, and to consider the

- 6 -

scheduling of motion and trial deadlines." *Id.* at 3. On July 16, 2019, the Court granted the parties'

motion and declared the case complex. Doc. 81, Order Decl. Case Complex. The Court set trial for

March 16, 2020. *Id.* The Court also set a status conference for November 21, 2019.

On August 16, 2019, Kevin Ross was appointed as substitute counsel for Brian Poe, who had

to withdraw from his representation of Faulkner. Doc. 86, Order Appointing Att'y. On August 29,

2019, the Government, Mr. Ross, and the FPD discovery coordinator conducted a "meet and confer"

on the discovery-related issues in the case. Doc. 92, Gov't's Resp., 9. The Government explained at

the meeting that a "rolling" production of discovery was necessary due to its volume. *Id.* This meant

that the discovery materials need to be processed at the Department of Justice's Litigation

Technology Service Center (LTSC) in Columbia, South Carolina, and then, once processed, they

are made available to the FPD discovery coordinator, who can then host the materials on their

software for the defense. *Id.* Also at this meeting, the Government provided defense counsel with a

written inventory of the ninety-one digital devices it hade imaged from a search warrant. *Id.* Only

fourteen of these devices had been reviewed by the Government and were being processed. *Id.* The

Government also identified 144 PST accounts that were imaged, thirty-six of which were deemed

relevant to the investigation. *Id.* The Government agreed that it would, upon request, provide

defense counsel with electronic imaging of any device that the Government had not reviewed and

processed. *Id.* Finally, the Government provided defense counsel with an inventory of investigative

and grand-jury materials that had been collected thus far. *Id.*

On October 17, 2019, the Government delivered the first installment of the rolling

production to the discovery coordinator. *Id.* at 10. The Government represents that this production

included "witness and victim interviews, all documents obtained by Grand Jury subpoenas, some

financial records, and hard copy records seized from the search of the defendant's company offices." *Id.* at 10 n.1. The Government delivered its second production to defense counsel on January 9, 2020. Doc. 92, Gov't's Resp., 10. On November 21, 2019, the Court held a conference to determine the status of the discovery disclosures. Doc. 87, Elec. Minute Entry. The parties represented that they would submit a joint proposed scheduling order by December 6, 2019. *Id.* On December 5, the parties filed a joint motion to remove the case from the Court's trial docket. Doc. 88, Joint Mot. The parties represented that discovery would not be completed until the end of March 2020 because more time was needed for the Government to complete its disclosure and for defense counsel to organize, analyze, and process the discovery. *Id.* at 2. The Court granted the order and set another status conference for March 26, 2020. Doc. 89, Order.

It is with this background in mind that the Court turns to Faulkner's motion to reconsider his order of detention. Doc. 90, Mot. to Reconsider. Faulkner filed his motion on January 2, 2020, asking that this Court reconsider and revoke the August 2, 2018 Detention Order (Doc. 20). Faulkner argues that his excessively prolonged pretrial detention now violates due process. Doc. 90, Mot. to Reconsider, 1. He asserts that this delay is attributable solely to the Government. *Id.* Faulkner also claims that the facts that previously supported his pretrial detention are no longer at issue. *Id.* The Government filed a response in opposition to Faulkner's motion. Doc. 92, Gov't's Resp.

On January 17, 2020, the Court held a hearing on Faulkner's motion. The Court heard argument from the parties, but took no witness testimony. The Court ultimately denied Faulkner's motion. This memorandum opinion provides the reasons for that order.

- 8 -

## II.

## LEGAL STANDARD

A.    *Reopening a Detention Hearing Under 18 U.S.C. § 3142(f)*

18 U.S.C. § 3142(f) provides that a detention hearing:

> may be reopened . . . at any time before trial if the judicial officer finds that
> information exists that was not known to the movant at the time of the hearing and
> that has a material bearing on the issue whether there are conditions of release that
> will reasonably assure the appearance of such person as required and the safety of any
> other person and the community.

B.    *Due Process Clause and Pretrial Detention*

"The Due Process Clause of the Fifth Amendment forbids pretrial detention that is punitive, rather than regulatory, in nature." *United States v. Stanford*, 394 F. App'x 72, 2010 WL 3448524, at *1 (5th Cir. 2010) (citing *United States v. Salerno*, 481 U.S. 739, 747–48 (1987)). "Absent an expressed intention to punish, whether detention constitutes impermissible punishment or permissible regulation turns on whether the government has a nonpunitive reason for detention and whether detention 'appears excessive in relation to' the nonpunitive purpose." *United States v. Stanford*, 722 F. Supp. 2d 803, 806 (S.D. Tex. 2010) (quoting *United States v. Millan*, 4 F.3d 1038, 1043 (2d Cir. 1993)). "Pretrial detention to prevent flight from the jurisdiction is an important, nonpunitive, regulatory purpose." *Id.* (citing, *inter alia*, *Salerno*, 481 U.S. at 749). "But 'excessively prolonged' detention may become so unreasonable in relation to the regulatory goals of detention that it violates due process." *Id.* (citing *Salerno*, 481 U.S. at 747 & n.4; *United States v. Hare*, 873 F.2d 796, 800–01 (5th Cir. 1989)).

In deciding whether there has been a due-process violation, the district court must consider on a case-by-case basis:

not only factors relevant in the initial detention decision, such as the seriousness of the charges, the strength of the government's proof that the defendant poses a risk of flight or a danger to the community, and the strength of the government's case on the merits, but also additional factors such as the length of the detention that has in fact occurred or may occur in the future, the non-speculative nature of future detention, the complexity of the case, and whether the strategy of one side or the other occasions the delay.

*Hare*, 873 F.3d at 800.

## III.

## ANALYSIS

Faulkner makes two arguments in support of his motion to revoke his pretrial detention. First, he argues that the factors that the Court previously relied on in ordering him detained are now moot. *See* Doc. 90, Mot. to Reconsider, 5. Second, Faulkner asserts that, based on the factors set out in *Hare*, his pretrial detention is and will be "excessively prolonged," thus violating due process. *Id.* at 4. For the reasons that follow, the Court rejected these arguments and **DENIED** Faulkner's motion.

A.    *Faulkner Presented No Material Information that Justifies Reopening His Detention Hearing.*

To start, the Court notes that delays or potential delays in trial are not considered in determining whether to reopen a detention hearing under § 3142. *See United States v. Simpson*, 2010 WL 3283053, at *2 (N.D. Tex. Aug. 19, 2010) ("*Hare* holds that 'the length of [the defendant's] current or potential future detention [cannot] be considered under [18 U.S.C. § 3142(f)] since it is not material to the issue of risk of flight[.]" (quoting *Hare*, 873 F.2d at 799) (alterations in *Simpson*)).  Thus, the Court does not consider Faulkner's arguments related to delays here.

Nonetheless, Faulkner argues two things have changed since the Court's previous detention order. First, Faulkner claims that he no longer has the financial means to flee the country because all his assets were seized or frozen. Doc. 90, Mot. to Reconsider, 5. For example, the SEC receiver

in the related civil action issued a stop payment on the cashier's checks that he was sending to Lebanon. *Id.* Second, he asserts that his mother Carole is no longer in Lebanon, but instead is living in Tarrant County, Texas. *Id.* He also asserts that the rest of his family, including his wife, is in California. *Id.* Thus, Faulkner concludes, this is new material information that changes the analysis under § 3142(f).

The Government responds that this additional information is not new or was not unknown to Faulkner at the time of the detention order. Doc. 92, Gov't's Resp., 11–12. The Government argues that the presence of Faulkner's wife in California was known to Faulkner at the time of his arrest. *Id.* at 12. Moreover, this fact did nothing to dissuade Faulkner from fleeing in the first instance, according to the Government. *Id.* Next, the Government asserts that Judge Toliver knew of the stop payment on the cashier's checks at the time of her detention order, as one of the Government's witnesses testified to this. *Id.* As for the fact that Carole Faulkner has returned to the United States, the Government admits that this is a "new development," but argues that this development should be counted against Faulkner. *Id.* The Government notes that Carole Faulkner has been described as a "co-conspirator" by Judge Toliver and has been held in civil contempt by Judge Fitzwater in the related SEC enforcement action. *Id.* The Government states that her presence in the United States "only heightens the government's concern that if released the defendant will flee." *Id.* at 12–13.

The Court finds that Faulkner has not sufficiently shown new or previously unknown information exists that has a material bearing on whether conditions of release exist that will reasonably assure his presence in court as required. *See Simpson*, 2010 WL 3283053, at *1–2 (citing § 3142(f)). The only new or previously unknown circumstance Faulkner presented is that his mother

- 11 -

no longer resides in Lebanon. But the Court tends to agree with the Government that this fact does not indicate he is less of a flight risk. As other judges in this district have noted, Faulkner and Carole Faulkner "had a history of working together in various schemes . . ." see Doc. 20, Detention Order, 7, and are potentially "coconspirators." Doc. 15, Judge Toliver's Order of Detention, 3. Moreover, Carole Faulkner has some history of disregarding orders from this Court. *See* Doc. 20, Detention Order, 8 (noting that both Faulkner and Carole Faulkner were held in civil contempt in the SEC civil enforcement action).

Further, the Court is not reassured that Faulkner no longer has ties to Lebanon or elsewhere. The previous detention orders gave credit the Government agent's testimony related to the unknown person "Bennie" from Lebanon, with whom the Faulkners were communicating. *See* Doc. 15, Judge Toliver's Order of Detention, 3; Doc. 20, Detention Order, 2–3. And this contact could still be available to the Faulkners. Thus, the Court is not persuaded that Faulkner no longer has ties to that country or elsewhere based solely on the fact that his mother now resides in Tarrant County. The Court agrees with the Government that the other grounds that Faulkner raises were known by Faulkner at time of the detention order. And Faulkner still has not shown that he has any stake in the United States, such as a residence or financial interests, that would militate against fleeing. In other words, there is no indication that Faulkner would no longer be living "off the grid," as Judge Toliver noted, if released. Doc. 15, Judge Toliver's Order of Detention, 3. Thus, the previous factors that both Judge Toliver and Judge Fitzwater relied on in ordering Faulkner detained still remain. The Court thus concludes that Faulkner has not met the § 3142(f) standard to reopen his detention hearing.

B.    *Faulkner's Continued Detention Is Permissible Under the Due Process Clause.*

- 12 -

As stated above, whether detention is or will be excessively prolonged such that it becomes punitive must be determined on a case-by-case basis. *Simpson*, 2010 WL 3283053, at *2 (citing *Hare* 873 F.2d at 801). The Court addresses each of the *Hare* factors in turn.

1.      Factors Relevant to Initial Detention Decision

The Court first must consider the factors relevant in the initial detention decisions—*e.g.*, the seriousness of the charges, the strength of the Government's proof that Faulkner poses a risk of flight, and the strength of the Government's case on the merits. *Hare*, 873 F.2d at 801. The analysis in Part A of this Order is relevant here and weighs against a due-process violation—as the Court noted, Faulkner has not presented any new or previously unknown information that indicates he would be more likely to appear as required, and the previous circumstances that supported his pretrial detention remain. Moreover, in his memorandum opinion and order, Judge Fitzwater conducted a thorough *de novo* review of these factors based on the evidence presented at the detention hearing before Judge Toliver. Doc. 20, Detention Order, 6–9. Judge Fitzwater's decision was then affirmed by the Fifth Circuit. Doc. 42, Mandate of Fifth Circuit. The Court finds that the facts and reasoning of Judge Fitzwater's order remain applicable under this *Hare* factor and support Faulkner's continued detention. *See Simpson*, 2010 WL 3283053, at *2 (finding that, absent new material evidence supporting his release, a previous detention order supported continued detention) (citing *Stanford*, 722 F. Supp. 2d at 807–08).

Additionally, as the Government notes, some of the original factors weigh heavier against Faulkner now. For example, the charges against him have only grown more serious—he now faces a twenty-one count indictment as opposed to a criminal complaint for three statutory violations. Doc. 92, Gov't Resp., 14. Faulkner is also now aware of his guidelines offense level through the

presentencing report prepared after his now-withdrawn guilty plea, which calculates his total offense

level as 43 with a sentence of life. *Id.* In sum, the Court finds that the original flight-risk factors still

support continued detention.

2.      Length of Detention That Has Occurred or May Occur

The Court now turns to the first additional factor to consider, which is the length of the

detention that has in fact occurred or may occur in the future. *Hare*, 873 F.2d at 801. "Although the

length of pretrial detention is one factor courts are to consider, it alone is not dispositive and carries

no fixed weight in a due process analysis." *Stanford*, 722 F. Supp. 2d at 807 (collecting cases).

"Indeed, length of detention 'will rarely by itself offend due process.'" *Id.* at 807–08 (quoting *United*

*States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993)). Currently, Faulkner has been held in pretrial

detention for 18 months. Doc. 90, Mot. to Reconsider, 5. This case has already been declared

complex, and both parties have represented it as such in numerous filings to this Court. *See supra* at

5–8. In similarly complex matters, other courts have found that comparable delays do not violate due

process. *See Simpson*, 2010 WL 3283053, at *3 (holding that 16-month delay in a complex matter

did not violate due process); *Stanford*, 722 F. Supp. 2d at 808–09 (holding that 19-month delay in

complex securities and mail fraud case was not punitive in nature).[1] While the Court acknowledges

that the length of the delay—both that has occurred and that has yet to occur—weighs in Faulkner's

---

[1] As the Fifth Circuit has noted, other courts have upheld much longer pretrial detentions. *See United States v. Stanford*, 394 F. App'x 72, 2010 WL 3448524, at *2 (citing *United States v. El–Hage*, 213 F.3d 74, 77–79 (2d Cir. 2000) (upholding thirty-month pretrial detention despite unforeseeability of continued delay); *Millan*, 4 F.3d at 1044 (considering thirty-month detention)). The Court is also persuaded by the cases cited by the Government. *See* Doc. 92, Gov't's Resp., 16 (citing, *inter alia*, *United States v. Swinton*, 251 F. Supp. 3d 544, 555 (W.D.N.Y. 2017) (holding that four-year pretrial detention did not violate due process in complex case where the defendant faced potential life sentence) and *United States v. Akinola*, 2016 WL 3566958, at *2–3 (D.N.J. June 28, 2016) (finding five-year pretrial detention did not violate due process)).

- 14 -

favor, the Court is not convinced that it outweighs the others that must be considered.

       3.      <u>The Nonspeculative Nature of Future Detention</u>

There is currently no trial date set for this case. The Court previously set trial for March 16, 2020. *See* Doc. 81, Order Declaring Case Complex. The Court vacated the trial date based on a joint motion from both parties that more time was needed to complete discovery. Doc. 88, Joint Mot., 2–3. Instead of continuing the trial date, the parties asked that the Court remove the case from the trial docket and schedule a status conference in March 2020, at which the parties believe they will be in a better position to advise the Court on what discovery issues remain and "a realistic trial date given the complexity and voluminous nature of the case." *Id.* At the hearing held on the current motion, the Government was reluctant to guarantee that production would be finished by the time of the status conference, but was generally optimistic it could be accomplished in that time frame.  Based on the representations from the hearing, the Court is confident that a trial date will be set at the March status conference. Regardless, the reason there is no trial date rests as much with Faulkner as it does with the Government.

       4.      <u>The Complexity of the Case</u>

No one has disputed that this case is complex. Both Faulkner and the Government have made this representation to the Court on numerous occasions during the course of this litigation. The Court has declared the case complex. Doc. 81, Order Declaring Case Complex. And since the original detention order, this case has only become more complex with the withdrawal of Faulkner's guilty plea, the twenty-one count indictment, and the necessity of a discovery coordinator for the defense team. The allegations involve a fraudulent scheme that went on for seven years and involved almost $150 million in investor funds. Doc. 88, Joint Mot., 2–3. The parties have represented that

discovery involves over 86 terabytes of data. *Id.* "When the complexity of a case is a reason for the length of the detention, the detention continues to be regulatory in nature rather than penal." *Simpson*, 2010 WL 3283053, at \*3 (quoting *Stanford*, 2010 WL 2745780, at \*4). That is undoubtedly the case here, and this factor weighs heavily in favor of continuing Faulkner's pretrial detention.

> 5.    Whether the Strategy of One Side or the Other Occasions the Delay

The last factor the Court considers is whether the strategy of one side or the other occasions the delay. "Any delay occasioned by prosecutorial strategy may be a basis upon which an exceedingly lengthy pretrial detention offends due process." *Simpson*, 2010 WL 3283053, at \*3 (quoting *Stanford*, 722 F. Supp. 2d at 810). Faulkner argues that the Government's delay in processing and producing discovery has caused the delay in this case and weighs heavily in favor of finding a due process violation. Doc. 90, Mot. to Reconsider, 8–9. The Government responds that most of the delay that has occurred in this case was due to Faulkner's plea-related conduct. Doc. 92, Gov't's Resp., 17–18. The Government notes that since Faulkner withdrew his plea, it has been working diligently to process and produce the remaining discovery, and has not engaged in any dilatory action to slow production. *Id.* In fact, on January 9, 2019, the Government delivered its second production of 188 gigabytes of SEC records to Faulkner. *Id.* at 10.

The Court agrees with the Government that no strategic decision on its part has occasioned the delay here. Indeed, as laid out in Section I above, Faulkner has moved for or agreed to every delay that has occurred thus far in this case. Before this motion, Faulkner has not complained of the Government's tactics or discovery procedures. Nor has Faulkner's counsel pressed for discovery it was not receiving. Instead, much of the delay has resulted from the plea-related occurrences and Faulkner's attorney change. The Court tends to agree with Faulkner that the Government could

have initiated the process sooner. However, this did not amount to a strategic decision on the part of the Government to slow the case down and punish Faulkner with a lengthy detention. The Court is instead convinced that the complexities of this case and the related discovery are the main culprits for this delay. The process that needs to occur before discovery can be produced—which includes sending the unprocessed discovery to a DOJ site in South Carolina, then back to Dallas, where the FPD office can host the discovery on their software for defense counsel—is not typical for a criminal case. *See id.* at 9–10. But it appears necessary based on the quantity and complexity of the information involved.

In sum, considering the above factors together, the Court finds that Faulkner's continued pretrial detention has not crossed the line from regulatory to punitive, such that it violates due-process rights. *Hare*, 873 F.2d at 801.

## IV.

## CONCLUSION

For the aforementioned reasons, Defendant Christopher A. Faulkner's Motion to Reconsider and Revoke the Pretrial Detention of Defendant (Doc. 90) is **DENIED**.


SO ORDERED.

SIGNED: January 23, 2020.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 17 -