```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION

UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )
vs.                           )3:18-CR-00500-B(1)
                              )
CHRISTOPHER AUNDRE FAULKNER,)
                              )
          Defendant.          )
```

                  SENTENCING HEARING
        BEFORE THE HONORABLE JANE J. BOYLE
           UNITED STATES DISTRICT JUDGE
               SEPTEMBER 20, 2021

              A P P E A R A N C E S
For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     214/659-8600
     BY:  MARCUS J. BUSCH
          KATHERINE A. MILLER

For the Defendant:

     LAW OFFICE OF AARON WILEY
     728 LBJ Freeway - Suite 250
     Dallas, TX  75240
     214/675-0676
     BY:  AARON L. WILEY

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

```
 1                    (In open court.)
 2                    This is Case Number 3:18-CR-500, United
 3      States v. Christopher Aundre Faulkner, and we are
 4      here for the sentencing of the case today.
 5                    Who is here for the Government?
 6                    MR. BUSCH:  Your Honor, Marcus Busch and
 7      Katherine Miller for the Government.
 8                    THE COURT:  You can take your masks off if
 9      you like.
10                    MR. WILEY:  And Aaron Wiley with
11      Mr. Christopher Faulkner, ma'am.
12                    THE COURT:  And Mr. Faulkner can take his
13      mask off, Mr. Wiley, if it's okay with you.
14                    MR. WILEY:  It's fine, Your Honor.
15                    THE COURT:  Would you, Mr. Faulkner, come
16      on up here.
17                    Good morning, Mr. Faulkner.  How are you?
18                    THE DEFENDANT:  Fine, Your Honor.  How are
19      you?
20                    THE COURT:  I have a bunch of questions I
21      will like to ask you today, and I will ask you to
22      raise your right hand.
23                    (Defendant sworn.)
24                    THE DEFENDANT:  Yes, Your Honor.
25                    THE COURT:  Let's first go through the
```

```
 1   paperwork I have in this case.
 2            The first think I have is the most recent
 3   presentence report filed February 26 of 2021.
 4            Have you read through that carefully,
 5   carefully, I mean paragraph by paragraph, word by
 6   word with Mr. Wiley?
 7            THE DEFENDANT:  Yes.
 8            THE COURT:  Any questions about it?
 9            THE DEFENDANT:  No, Your Honor.
10            I have the Government's statement in 138,
11   where they adopt the plea agreement.  Docket 138,
12   that's all.
13            And then I have an addendum to the
14   presentence report as 141-1.
15            Have you read carefully through this
16   addendum with Mr. Wiley -- no, let me finish --
17   before today?
18            THE DEFENDANT:  Yes, Your Honor.
19            THE COURT:  Paragraph by paragraph, word
20   by word.
21            THE DEFENDANT:  Yes, Your Honor.
22            THE COURT:  You understand the addendum.
23            THE DEFENDANT:  Yes, ma'am, I do.
24            THE COURT:  Mr. Wiley, do you agree with
25   both of those statements, that he's read the
```

1    presentence report and the addendum?

2              MR. WILEY:  I do, Your Honor.

3              THE COURT:  Okay.  And then I have a

4    second addendum, 148-1.  If you will pull that,

5    please.

6              MR. WILEY:  Yes, ma'am.

7              THE COURT:  And I hope there's some --

8    we're going to talk about that in a minute, but go

9    ahead.

10             Have you read through the addendum?

11             THE DEFENDANT:  Yes, ma'am.

12             THE COURT:  Okay.  With Mr. Wiley?

13             THE DEFENDANT:  Yes, ma'am.

14             THE COURT:  Any questions about it?

15             THE DEFENDANT:  No, ma'am.

16             THE COURT:  Okay.  Then I have the

17   defendant's response to the presentence report.

18   It's Document 149.  All right.  Take a look at that.

19             Have you reviewed it carefully with

20   Mr. Wiley before today?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Any questions about that?

23             THE DEFENDANT:  No, ma'am.

24             THE COURT:  Okay.  Then I have the

25   statement in 145 by the Government, where they say

```
1    that you have agreed to release certain seized
2    property listed in the forfeiture notice; is that
3    correct?
4              THE DEFENDANT:  Yes, Your Honor.
5              THE COURT:  We will go over that a little
6    bit later.
7              Okay.  I have several letters for you, and
8    I have read them.
9              Wait a minute.  Just a minute.
10             I have a sentencing memorandum, Document
11    150, filed by Mr. Wiley on your behalf.
12             Have you read through that with Mr. Wiley?
13             THE DEFENDANT:  Yes, Your Honor.
14             THE COURT:  Mr. Wiley, do you agree he's
15    read through all these documents with you carefully?
16             MR. WILEY:  I do, Your Honor.
17             THE COURT:  Do you have any questions
18    about it?
19             THE DEFENDANT:  No, ma'am.
20             THE COURT:  Do you, Mr. Wiley?
21             MR. WILEY:  No, ma'am.  My client is very
22    intelligent, and he makes me run through everything.
23    Yes, ma'am.
24             THE COURT:  Okay.  I have several letters
25    from victims, and I have read through them, and I
```

```
 1   would be glad to hear from some of them today.

 2             And I also have several letters for you --

 3   let me see.  Do I have several letters for you?

 4   Yeah.  Yeah.  Yeah.

 5             And finally, and I -- I don't fault the

 6   Government for this.  They filed a response to your

 7   report and addendum, objections to the report and

 8   addendum.  That's Document 152.  Have you read

 9   through that?

10             MR. WILEY:  Your Honor, he has not had an

11   opportunity to read entirely through that because

12   over the weekend it was closed.

13             THE COURT:  Go ahead and sit over there

14   and look it over with him.

15             MR. WILEY:  Thank you, Your Honor.

16             (Pause.)

17             THE COURT:  Who is going to be the lead on

18   this for the Government?

19             MR. BUSCH:  Your Honor, depends on the

20   nature of the inquiry.

21             THE COURT:  I was going to ask if you have

22   any victims here today.

23             MR. BUSCH:  We have just one.

24             THE COURT:  Who are the people?

25             MR. BUSCH:  I think they are here in
```

```
 1   support -- the agents on this side from the U.S.

 2   Attorney's Office.  There are a number of civilians

 3   here, and one is going to speak, Ms. Dyer.

 4            THE COURT:  Okay.  Thank you.

 5            MR. WILEY:  May we approach, Your Honor?

 6            THE COURT:  Yes.  Okay.  Have you read

 7   through the Government's response to your objections

 8   to the presentence report and the addendum?

 9            THE DEFENDANT:  Yes, I have, Your Honor.

10            THE COURT:  Document 152?

11            THE DEFENDANT:  Correct.

12            THE COURT:  And any questions about it?

13            THE DEFENDANT:  No, ma'am.

14            THE COURT:  Any questions about it,

15   Mr. Wiley?

16            MR. WILEY:  No, ma'am.

17            THE COURT:  Is there anything else other

18   than what I have mentioned that should be in the

19   record?

20            MR. WILEY:  I know that you mentioned the

21   letters.  I wasn't aware of the letters from

22   victims, and that's fine, I don't need to see those.

23   But everything else I'm aware of, and I believe that

24   is complete, Your Honor.

25            THE COURT:  Mr. Busch, anything else?
```

```
 1              MR. BUSCH:  No, Your Honor.
 2              THE COURT:  Ms. Miller?
 3              MS. MILLER:  No, Your Honor.
 4              THE COURT:  Nothing else.
 5              MS. MILLER:  That's correct, Your Honor.
 6              THE COURT:  Okay.  Then you can go sit
 7    down for a minute, and we're going to talk about the
 8    objections.
 9              Go ahead, Mr. Wiley.
10              MR. WILEY:  Yes, Your Honor.
11              I thought that the Government did agree to
12    some of the objections.
13              THE COURT:  Well, the abuse of trust,
14    right.
15              MR. WILEY:  Yes, and the acceptance of
16    responsibility.
17              THE COURT:  Well, I know, but I'm not
18    going to go with that.  But go ahead.  Abuse of
19    trust, yes.
20              MR. WILEY:  It is the defense position
21    that it is difficult to ride both ponies, i.e., that
22    as we stand here today, I understand there is a
23    civil case out there, and there's a receiver in that
24    case.  And there are certainly people who are being
25    held responsible, starting with administrative
```

```
 1    responsibility, there's civil responsibility, and
 2    there's criminal responsibility.
 3              My client --
 4              THE COURT:  Mr. Faulkner, are you looking
 5    over here?
 6              THE DEFENDANT:  I am.  I'm sorry.
 7              THE COURT:  Go ahead.
 8              MR. WILEY:  My client is obviously the
 9    only person.  He takes no hubris with -- with that,
10    that he's the only person being criminally
11    responsible.
12              However, it is difficult to balance that
13    he's the only person being held criminally
14    responsible, but he has a role as a leader organizer
15    with other -- with other people who are certainly
16    being held civilly responsible, as they are named in
17    the companion civil cases in front of Judge
18    Fitzwater.
19              THE COURT:  Uh-huh.
20              MR. WILEY:  And so it's difficult to
21    intellectually be consistent in arguing that he's a
22    leader organizer and other folks are responsible,
23    but they are not -- they are not responsible at the
24    same -- at the same level.
25              THE COURT:  But that's really not a legal
```

```
 1   objection, is it?

 2           MR. WILEY:  It is an equitable -- I would

 3   agree that -- that I did differentiate between the

 4   criminal and the civil liability of individuals.

 5   And so, yes, it could be considered not at legal

 6   objection.

 7           THE COURT:  I mean, if you want it to be

 8   legal, it's legal.  But I just don't understand

 9   because, you know, they can do what they want to do

10   with charging.

11           MR. WILEY:  Absolutely.  Absolutely.  And

12   I don't pretend to have that discretion any longer,

13   to have prosecutorial.

14           THE COURT:  I mean, I think a lot more of

15   these guys should have been prosecuted, but go

16   ahead.

17           MR. WILEY:  Yeah, and I share the Court's

18   belief.  But my client takes the position that he

19   wouldn't want other people to be criminally charged.

20           But it is me just pointing out that there

21   is a dichotomy there to be a leader organizer in a

22   criminal enterprise, for lack of a better word,

23   where other people are not considered adjoining

24   criminals for lack of . . .

25           THE COURT:  Okay.  Okay.  You also object
```

```
 1   that there's not five people in it?

 2              MR. WILEY:  Yes.

 3              THE COURT:  Okay.  Okay.  If you will step

 4   aside, I want to hear from the Government on this.

 5              Ms. Miller, please speak into the

 6   microphone.

 7              MS. MILLER:  Your Honor, the four-level

 8   enhancement for organizer leader requires two

 9   things:  That the -- well, three things, but I don't

10   think the first one is in dispute, which is that the

11   defendant had basically the top managerial role.

12   That's not in dispute.

13              Secondly, that he directed another

14   criminal participant.  He only has to direct one

15   under this section of 3B1.1.  And the Government

16   would submit there were multiple people who were

17   criminal participants, not merely just involved in

18   the scheme.  Parker Hallam, to some extent he was

19   criminally responsible because he had control over

20   the operations of some of the subsequent companies.

21              THE COURT:  Slow down a little bit.  Okay.

22              Slow down just a little bit.  Okay.

23              MS. MILLER:  Michael Miller also had

24   control of one of the later entities, which

25   solicited funds and resulted in losses to the
```

12

1    victims.

2            The PSR talks about in paragraph 27 how

3    the geologist, Mr. Simo, inflated the estimated

4    production and then of course Mr. Faulkner took the

5    inflated numbers and -- and doubled or tripled them

6    in some cases.

7            So those are just three examples of

8    criminal participants.  To some extent, Beth Hankins

9    could be considered criminally liable.

10           THE COURT:  What section are you talking

11   about, 3B what?

12           MS. MILLER:  3B1.1, the organizer leader

13   aggravating role enhancement.

14           THE COURT:  Anything else?

15           MS. MILLER:  Unless I misunderstood the

16   objection that was made, it appears that the

17   defendant is arguing that it has to be both five

18   criminal participants and otherwise extensive, but

19   that's not the plain language of the four-level

20   enhancement.

21           This offense was otherwise extensive under

22   the case law and the section which includes the well

23   operators, the people handling his bank accounts,

24   the people that worked for him, the salespeople, the

25   investors, I mean it's clearly extensive.

```
 1              THE COURT:  Thank you, Ms. Miller.
 2              MS. MILLER:  Thank you.
 3              THE COURT:  Mr. Wiley, come on back up.
 4              Anything else?
 5              MR. WILEY:  Again, we would agree -- and I
 6    certainly believe that counsel is correct -- that my
 7    client, as the president and founder, is clearly --
 8    and he accepts that role -- is clearly responsible.
 9    It's just the roles of the -- of the other people
10    that he takes some -- some difficulty with.  But he
11    is in no way saying that he's not responsible.
12              THE COURT:  It says here 3B1.1(a):  If the
13    defendant was an organizer or leader of a criminal
14    activity that involved five or more participants or
15    was otherwise extensive, increase four levels.
16              I think they've got it.  I mean, my gosh,
17    it was so extensive, and they had five or more
18    people, at least five or more people.
19              So I'm going to overrule that objection,
20    Mr. Wiley.
21              MR. WILEY:  Okay.
22              THE COURT:  Go on to your next one.
23              MR. WILEY:  The next one was the -- was
24    the obstruction of justice.
25              THE COURT:  Uh-huh.
```

```
 1              MR. WILEY:  And that really has to do --
 2    oh, the obstruction of justice was actually -- it's
 3    long, but at the end it does say that it's not
 4    applicable, I believe.
 5              THE COURT:  Yes.  I mean -- wait, I -- I
 6    think obstruction of justice is applicable.  Go
 7    ahead.
 8              MR. WILEY:  Okay.
 9              THE COURT:  I think -- does he get points
10    for it?
11              MR. WILEY:  Is that right?
12              (Discussion between Mr. Wiley and
13              prosecutor.)
14              THE COURT:  Yeah, gave him two points.
15              MR. WILEY:  Okay.  The position is that
16    the actions in which they speak of, they occurred
17    before the -- before this criminal case.
18              The primary thing is that, when acting in
19    a business world, it is not unusual for -- for folks
20    to, however it is within a civil arena, which is
21    where this law is, to, in their mind, fight back
22    to -- to get lawyers, to try and push back.  That
23    was well before the -- the criminal case was known.
24              It's -- it's -- it acted as if it was
25    imparted on my client, that because investigators
```

```
 1   were working within the SEC and raids were done,
 2   those are done in civil -- in civil cases.  And so
 3   that was not necessarily a beacon for him to know
 4   that, I'm getting indicted.  In fact, he wasn't
 5   indicted until many years later after a complaint
 6   was -- was filed.
 7            And so the movement of money, although
 8   wrong, certainly wrong, even within a civil confine,
 9   that was not done to obstruct a known criminal
10   investigation.  They impart knowledge on him back in
11   2015, 2016, when the case, you know, wasn't
12   indicted, he wasn't arrested until years later.
13            THE COURT:  Okay.  Thank you, Mr. Wiley.
14            Ms. Miller, please come up here and give
15   me your response.
16            And slow down, please.
17            MS. MILLER:  Your Honor, I think it's
18   helpful to just revisit what formed the basis of the
19   obstruction enhancement.
20            THE COURT:  Please go into detail if you
21   need to.
22            MS. MILLER:  Well, there are several
23   things.  But the PSR talked about this in paragraph
24   58 and other paragraphs.
25            But specifically, the defendant and his
```

1    mother opened a mailbox for the purpose of diverting

2    oil and gas payments after the -- the civil CEA --

3    I'm sorry --

4              THE COURT:  SEC.

5              MS. MILLER:  -- SEC action had an

6    appointed --

7              THE COURT:  Receiver.

8              MS. MILLER:  -- a receiver appointed, and

9    there was an order freezing his assets, and then

10   preventing the defendant from diverting the mail

11   anywhere else.

12             The order specifically provided that he

13   was not to open any other mailboxes.  The receiver

14   was receiving production checks and other mail

15   related to the wells' operations, and in order to

16   have the receiver effectively do his job, the mail

17   was directed there.

18             So the obstruction enhancement is twofold:

19   It obstructed the receivership in obtaining funds to

20   be used in the corrupt operation of the --

21             THE COURT:  Returning money to people,

22   right?

23             MS. MILLER:  Right.  But also the fact

24   that this defendant tried to divert incoming

25   production checks to another mailbox thwarted the

```
 1   Government's ability in the criminal side to obtain
 2   the money back for the victims.
 3             And just for the Court's edification, the
 4   timeline here is search warrants were executed at
 5   the defendant's business location in April of 2016.
 6             THE COURT:  Okay.  Search warrants in the
 7   criminal case?
 8             MS. MILLER:  Yes.
 9             THE COURT:  Okay.
10             MS. MILLER:  Seizure warrants for some
11   cashier's checks were obtained from a United States
12   Magistrate Judge in July of 2017.
13             So the defendant -- and those were
14   attempted to be executed as well, and the defendant
15   knew about that as well.
16             And then the new mailbox was opened in
17   August of 2017.
18             So the defendant was clearly aware of the
19   criminal investigation and the SEC's action by the
20   time he committed this conduct.
21             And the Government would also say, the
22   fact that the defendant's mother took proceeds from
23   the sale of his home and converted them into
24   cashier's checks and then sent them elsewhere and
25   that the defendant tried to flee the country in
```

 1    2018, while being prosecuted and knew that he was

 2    under a deadline to give the Government an answer on

 3    its proposed resolution of the criminal case, all

 4    support the obstruction enhancement.

 5              THE COURT:  Okay.  Thank you very much.

 6              Mr. Wiley?

 7              Mr. Wiley?

 8              MR. WILEY:  Yes.

 9              THE COURT:  Come on back up here.

10              Anything else?

11              MR. WILEY:  On that point, no.

12              THE COURT:  I mean, the obstruction of

13    justice is replete throughout this case from 2016

14    on.  And she has given us a good summary of it, but

15    it's in their response at Document 152.  It's also

16    in the presentence report at Document 58.  And you

17    know, it is -- it is just amazing how much this man

18    diverted things and hid things and did secret things

19    in the effort to avoid criminal prosecution and

20    civil liability.

21              It's obstruction of justice, and I'm going

22    to sustain the -- overrule the objection.  Okay?

23              MR. WILEY:  Yes, ma'am.

24              THE COURT:  Okay.  Let's go to the next

25    one.

```
 1              MR. WILEY:  May I have one moment?
 2              THE COURT:  Yeah, absolutely.
 3              MR. WILEY:  The other one I wanted to -- I
 4    believe this is the last one.
 5              THE COURT:  There's several.  There's
 6    amount of loss.
 7              MR. WILEY:  That's where I was going.
 8              With the intended loss, the -- although
 9    there was obviously -- and the Court has ruled that
10    there were attempts to -- to move money, hide money,
11    at the beginning of this endeavor, I don't believe
12    that was -- I think there's evidence to support that
13    that was not the intent, i.e., expert lawyers were
14    hired, there were -- these are not dry holes.  What
15    we had was a person that inflated the cost of --
16              THE COURT:  So there was some benefit
17    going to the investors?
18              MR. WILEY:  Absolutely.
19              THE COURT:  What kind of benefits?
20              MR. WILEY:  Royalties.  Royalties that to
21    this day the receiver, who has been very competent
22    in this case -- that's the companion case -- has
23    been clawing back.  That money has come back in
24    large amounts of money, and it still is there.
25              And so it wasn't intended that folks
```

20

 1   weren't going to get anything, and that was not the

 2   intent.  But as my client will speak to this later,

 3   that there was a time, obviously -- and that's why

 4   we're here in criminal court here today -- where

 5   that changed.

 6           But the initial, when they went in, the

 7   hiring of lawyers, the hiring of experts, the

 8   looking at liabilities, there was an attempt to do

 9   things the right way.  And at some point -- and we

10   will talk about that at the appropriate time -- that

11   went off the rails.

12           The other thing about -- about intended

13   loss is, it is a little bit difficult, because when

14   I first came into this case, I thought, well, I know

15   it's complicated, because there's a lot of

16   discovery.  What I did not realize was the enormity

17   and the fluidity of the other case, because there

18   are numbers that are associated with that case that

19   fluctuate.  In fact, they fluctuate quarterly.  As

20   this very successful receiver pulls back and claws

21   back money, the amount of restitution changes.

22   Similarly, depending on when you look at it, the

23   amount of loss changes.

24           THE COURT:  You're not contesting the

25   amount of restitution, though, right?

1              MR. WILEY:  I'm not contesting the amount

2       of restitution from this standpoint --

3              THE COURT:  Okay.

4              MR. WILEY:  -- that my client is prepared

5       to -- you're the only Article Three person here.

6       You're going to take anything that you tell him is

7       the right thing, and you have that discretion.

8              What I am trying to impart is:  One, it

9       was not the intent that everybody is going to lose

10      in this deal, to start with; and two, that there are

11      differing numbers out there.

12             And so when you put out the number as

13      probation -- I know that they did a good job, as

14      they put out there, that does not take into

15      consideration the actual cost of drilling.  That

16      doesn't take into consideration the cost of actually

17      doing the real business, not the inflated business,

18      but the real business.  So we have at the end of the

19      day a very large number.  But that was not the

20      intent, or else there would not have been the actual

21      drilling of wells.  There would not have been the

22      distribution of royalties.

23             And the one thing that I had, although it

24      doesn't change what counsel said about the

25      obstruction piece, is that at the time, the

```
 1   royalties weren't a part of the receivership when
 2   they talked about he took some of those checks.  It
 3   wasn't part of the receivership.  It is now, but it
 4   wasn't back then.  I'm not rearguing that, you
 5   already ruled on that, but I wanted to give the
 6   Court additional information on that.
 7            So while that number is big, and my client
 8   is prepared to settle up with that as best he can
 9   throughout the remainder of his life, we want the
10   Court to know that that was not the intended -- he
11   will have his own opportunity to explain.  I won't
12   attempt to do that at this juncture, because we are
13   at a different point in the sentencing procedure.
14            THE COURT:  Thank you, Mr. Wiley.
15            MR. WILEY:  Thank you, Your Honor.
16            THE COURT:  Thank you.
17            Who is going to speak to this?
18            Ms. Miller, come on up.
19            MS. MILLER:  Your Honor, the --
20            THE COURT:  Speak into the microphone,
21   please.
22            MS. MILLER:  -- the sentencing guidelines
23   ask the Court -- or directs the Court to make a
24   reasonable estimate of the loss, and plainly directs
25   or instructs the greater of intended loss or actual
```

23

```
1    loss.
2              THE COURT:  Uh-huh.
3              MS. MILLER:  I understand that Mr. Wiley
4    is attempting to say there was some kind of service
5    rendered or that the defendant incurred costs.  But
6    when you actually look at the Sentencing Guidelines'
7    direction in 2B1.1, the Court's reasonable estimate
8    of loss would be, what did the defendant do in terms
9    of soliciting funds?  He -- I mean, it's very well
10   detailed in the PSR about all the --
11             THE COURT:  Give me the section.  2B1.1
12   what?  2B1.1?
13             MS. MILLER:  Well, 2B1.1, initially (b),
14   but then if you look at the commentary, the
15   commentary starts at Application Note 3 --
16             THE COURT:  Yeah.
17             MS. MILLER:  -- where loss is defined as
18   greater -- right.
19             So I think that Mr. Wiley is trying to
20   argue under subsection (e) that there might be some
21   credit due him because his fraudulent scheme
22   actually incurred costs through his companies.  But
23   it's --
24             THE COURT:  Subpart (e), let me just find
25   that.  Where is (e)?
```

24

```
 1              MS. MILLER:  It's Application Note 3(e),
 2   and that is credits against loss, which he --
 3              THE COURT:  Okay.  Let me just find that.
 4              (Pause.)
 5              MS. MILLER:  Your Honor, if it's the 2018
 6   PSR -- I mean Sentencing Guidelines Manual, that
 7   would be page 91.
 8              THE COURT:  Okay.  Okay.  Okay.  Yes, I
 9   see it.  Okay.  Go ahead.
10              MS. MILLER:  His position is just not
11   grounded in anything set forth in the Sentencing
12   Guidelines.
13              He points the Court to the subsection (e)
14   credits against loss, and then today has argued,
15   well, the defendant's companies incurred expenses
16   and so forth.  But there's nothing in subsection (e)
17   or frankly in any of the other parts of the
18   application note that allow any deduction in this
19   fraudulent scheme.
20              You know, the fraud scheme is basically
21   false statements to investors, inflated amounts
22   inducing them to send their money, and then he just
23   pocketed huge amounts over and above what the
24   investors received back.  And the PSR details that
25   quite -- at quite some length.
```

```
 1              And so we would urge the Court not to
 2    follow this faulty reasoning.
 3              THE COURT:  Okay.  Thank you.
 4              Mr. Wiley, come on up.  Anything else?
 5              MR. WILEY:  No, ma'am.  I believe that --
 6    that sums up the -- the portion that we're
 7    addressing here, ma'am.
 8              THE COURT:  I'm going to agree that this
 9    comports with 2B1.1(b) -- is it (b)?
10              MR. WILEY:  Yeah.
11              THE COURT:  -- and the commentary, and
12    that the enormity and the complexity of this boils
13    down to people didn't get what they asked for.
14    People didn't get what they paid for over and over
15    again, over what, five years, six years?
16              MR. WILEY:  I believe it's five.
17              THE COURT:  Yeah.  So, you know, I think
18    the intended loss is best we can do is
19    $149,524,548.90, and I'm going to keep it at that.
20              I understand this may fluctuate a little
21    bit, but that's -- you know, we can only make a
22    reasonable guess.  So that's -- that's what I see is
23    the intended loss.
24              MR. WILEY:  Yes, ma'am.
25              THE COURT:  So I will overrule that
```

26

```
 1    objection.

 2              Let's move on to your other.

 3              MR. WILEY:  I believe that was the --

 4              THE COURT:  Mr. Busch?

 5              MR. BUSCH:  One moment, Your Honor.

 6              THE COURT:  Okay.

 7              (Discussion off the record between

 8    Mr. Busch and Mr. Wiley.)

 9              THE COURT:  You had sophisticated means.

10              MR. WILEY:  I had sophisticated means.

11              Your Honor, at -- at that point, once this

12    company was -- was formed, it was just a matter of

13    after sophisticated investors got through the -- the

14    initial screening process, it was simply a matter

15    of -- just no other way to say it, and I think the

16    Court said it a moment ago -- that it was just not

17    telling them the truth.

18              THE COURT:  Yeah, right.

19              MR. WILEY:  And I -- I don't know other

20    than him having hired other people, him being my

21    client, other people around him, that -- that -- how

22    that rises to the level of sophisticated means.

23              THE COURT:  Okay.  All right.  Ms. Miller,

24    anything you want to say on that?

25              Come on up.
```

```
 1              MS. MILLER:  The sophisticated means

 2    enhancement is appropriate for fraud schemes like

 3    this one.

 4              THE COURT:  Hold on a second.

 5              What's going on?

 6              (Marshal asking someone to remove gum from

 7              their mouth.)

 8              THE COURT:  Okay.  Okay.  Thank you.

 9              Go ahead.

10              MS. MILLER:  For fraud schemes that use

11    fictitious entities or corporate shells, a

12    sophisticated means enhancement is appropriate.  In

13    2B1.1 application note 9(b), the commentary

14    describes that as a scenario where this enhancement

15    would be applicable.

16              And not only did the PSR detail the

17    nominee companies that Mr. Faulkner utilized to

18    route all these funds through, but his own factual

19    resume, he stipulated to that, as well.  So we would

20    ask the Court to apply the enhancement.

21              THE COURT:  I'm going to apply it.  It's

22    very sophisticated.  I don't know what else to say.

23    The presentence report and all the addendum and the

24    Government's response, it's absolutely

25    sophisticated.  There's no doubt about it.  I don't
```

```
1   need to go into detail on that, so I overrule that
2   objection.
3              Are there any other objections you had,
4   Mr. Wiley?
5              MR. WILEY:  The only other objection I
6   believe was abuse of position of trust.
7              THE COURT:  And they gave you that.
8              MR. WILEY:  Yes.
9              THE COURT:  They agree with that, so I'm
10  going to agree with that, too.  And that would take
11  you down to offense level -- let me see -- 41, is
12  that right?
13             USPO:  No, Your Honor, it will stay a 43.
14  Because the two levels will come off the adjusted
15  offense level, which is a 50, it will become 48, so
16  it will remain a 43.
17             THE COURT:  All right.  Let me see if I
18  agree with that.
19             Okay.  Tell me that again.  The adjustment
20  level would --
21             USPO:  In the presentence report, the
22  current adjusted offense level is a 50.
23             THE COURT:  Would you take your mask off,
24  please?
25             USPO:  Yes.
```

```
 1              THE COURT:  Thank you.
 2              USPO:  So by taking off those two points
 3    for abuse of position of trust, the adjusted offense
 4    level would become a 48.  And so because the highest
 5    guideline in the guideline manual is a 43, it would
 6    remain a 43.
 7              THE COURT:  I gotcha.
 8              Mr. Wiley, do you understand that?
 9    Anything else?
10              MR. WILEY:  I do.  And I think the last
11    one was that the Government allow for acceptance of
12    responsibility, if that wasn't already raised.
13              THE COURT:  I don't agree with that.
14              MR. WILEY:  Okay.
15              THE COURT:  So this stays the way it is.
16              I mean, I don't agree with it, because I
17    think Mr. Faulkner has, since the beginning -- and
18    probably still now -- is continuing -- well, I'll
19    see what he has to say.  But this is just a fraud
20    that lasted so long, I don't see any acceptance of
21    responsibility, especially with the obstruction of
22    justice note, and I think it would be odd to have
23    both.  But I think I could do both, but I'm not
24    going to.
25              So, okay.  Go ahead, Mr. Wiley, come on
```

1   up, and let's just hear your argument.

2             MR. WILEY:  Okay.

3             THE COURT:  Do you want to call somebody

4   or anything?

5             MR. WILEY:  I didn't know if you wanted to

6   hear from the victim that was here first or --

7             THE COURT:  No, I will wait until the

8   Government's case.

9             MR. WILEY:  Okay.  This is a complicated

10  case and a complicated man.  I think the judge has

11  figured a lot of it out.  I would like, as best I

12  can, to fill in some of the portions that aren't

13  necessarily present in a presentence report and

14  aren't present in the facts of the -- of the case.

15            THE COURT:  Okay.

16            MR. WILEY:  It's a complicated case

17  because, as I have alluded, there is a criminal

18  case -- it's not just complicated because of the

19  tremendous amount of discovery or because I am the

20  third attorney that has represented my client.  It

21  is complicated in part because this case had its

22  genesis in an SEC case.

23            And that's not unusual for the

24  Government -- and the Government often does -- is to

25  run criminal and civil cases concurrently.

```
 1              What is unusual is for -- it's above my
 2   pay grade, so I'm not offering any criticism, please
 3   understand that -- that it is unusual for one case
 4   to go to one court and another case to go to another
 5   case -- court.
 6              It is also unusual for, as this happens
 7   often -- for the civil case not to be stayed.
 8   Because in most instances, or at least instances in
 9   my limited experience that I am familiar with, that
10   the civil case is stayed and the criminal case
11   proceeds.
12              In this case that, of course, didn't
13   happen.  And why they don't often proceed is because
14   the criminal case and the civil case involve the
15   same set of facts and most often the same set of
16   defendants.
17              THE COURT:  Did they file a motion for
18   stay?
19              MR. WILEY:  Not to my knowledge.  I came
20   in much later.
21              THE COURT:  Motion for stay in the civil
22   case.
23              MR. WILEY:  Not to my knowledge.  I came
24   in much -- much later.  I came in when we were set
25   to be here.
```

                    32

1                  And again, that didn't -- that didn't
2       happen.  And perhaps it didn't happen because it was
3       just one person in the criminal case and there were
4       many people in the civil case; and there were
5       disenfranchised investors that were sophisticated
6       investors, meaning that they either had a million
7       dollars set aside or had made $250,000 in successive
8       years, you have to be certain people to be
9       investors.  But that didn't happen.
10                 A receiver was appointed.  To my
11      understanding, and from what I have been able to
12      glean and read, a very good receiver; aggressive,
13      clawing back money, following lawsuits, harrowing
14      firms, getting summaries done.  That has been
15      largely successful from what I can see.  The numbers
16      that have come back are over $21 million as far as
17      the latest quarterly report, which I believe was in
18      June.
19                 The difficulty is that there's only one
20      person that is responsible here.  And the -- and the
21      calculus that's used in the civil case is different
22      than what we use in the criminal case.
23                 They spend sumptuous amounts of money
24      hiring accountants and forensic accountants to look
25      at things; whereas here, we are relying largely on

33

1   our -- our overworked prosecutors and Court -- Court

2   support staff and folks --

3          THE COURT:  Well, the Government has lots

4   of agents working on it, though.

5          MR. WILEY:  Yes.  Yes, they do.  That made

6   it complicated for me, because I saw a lot of

7   different numbers.

8          And I majored in English, and figuring out

9   all those numbers is not my strong suit.  We try our

10  best, but it is confusing.  It's hard to explain to

11  a client who is a smart guy what's going on with

12  that, because I knew the number was this when we

13  started, and now it's this.

14         THE COURT:  Are you talking about intended

15  loss?

16         MR. WILEY:  Yeah, talking about the loss

17  and the restitution.  That number has changed

18  throughout time.  But that's not what we are here to

19  argue about, because those numbers are so large that

20  it's not going to make a -- it's not going to make a

21  difference.

22         But what I do want to impart is that he

23  would want you to know that he didn't do it alone,

24  and he didn't do it all by himself.  And so even

25  those he's responsible for it, he's not

```
 1   140-million-dollar man that got everything.
 2             THE COURT:  He did get a lot though.
 3             MR. WILEY:  He did get a lot.  I'm not
 4   saying he didn't.
 5             THE COURT:  He was traveling all over the
 6   world.
 7             MR. WILEY:  Yes, absolutely.  I'm not here
 8   to contest that.  Complicated person.  This is a
 9   complicated man and a complicated case.
10             Complicated person, because like many
11   self-made people, he's highly intelligent, highly
12   motivated, person out front.  He had a good
13   upbringing or so it appeared.  He was a smart kid
14   always, in Grapevine.  He had a great GPA while he
15   was there.
16             THE COURT:  Yeah.
17             MR. WILEY:  I would be envious of that for
18   my kids.
19             But he curiously didn't finish college.
20   But that, in these days and time, that's not that
21   uncommon.  You have Zuckerberg, you have Gates, you
22   have even Dick Cheney didn't finish college; doesn't
23   mean they are any less intelligent.
24             The thing that my client had working
25   against him -- had many successful businesses
```

1    through the years, this is isn't his first business

2    endeavor.  And by all accounts, as we look on his

3    record as a business person, that wasn't there.

4    There wasn't a problem.  Everything looked

5    successful.

6              I believe that there was one slight

7    indication that could have told us what was really

8    going on, and that was when my client was a

9    passenger in a vehicle where he was so intoxicated

10   that he, too, although not the driver, was arrested.

11   And when he was arrested, there was found user

12   amounts of cocaine.  If we had looked deeper at that

13   point, we would have known that my client suffered

14   from something that the other highly successful

15   people that I mentioned didn't, and that's

16   addiction.

17             It's also an inflated view of one's

18   father.  It's been said, so I understand, that gold

19   star children do well in life in spite of the

20   absence of a parent that was lost because they have

21   the ideal of a hero that they strive to be.

22             My client had a hero that he never met.

23   That was his father.  He believed that his father

24   was smart, like he was.  He believed that he was a

25   personality bigger than life and that he was

```
 1   well-to-do.  Partier.  That's what, if you really
 2   got down to it, what my client thought was a
 3   standard.  That's why he was hard-charging.
 4          He didn't go into business to be a
 5   criminal or a convicted felon.  He did it to be
 6   successful in his mind.  Somewhere -- and his key to
 7   success was always to surround himself with smart
 8   people and then listen to the advice that they gave
 9   him.  But at some point, he stopped listening to
10   that advice.  He started listening to the goal that
11   he thought he wanted to have, and more importantly
12   feeding his own addiction.
13          I believe my client will tell you the
14   plethora of narcotics that he was on.  And in my
15   mind -- and having seen many defendants on both
16   sides of the table -- you can only dance with the
17   devil so long, because the devil's music doesn't
18   change.  The dance doesn't change.  You change.
19          And so what he thought were good business
20   investments and good business decisions ended up
21   just being a way to fuel his own addictions.  And
22   it's tragic.  It's absolutely tragic, because my
23   client had friends, he had lawyers.  We sat in the
24   their offices with marbles, and they would give him
25   a drink and drink a Coca-Cola and maybe a drink of
```

```
 1   alcohol.  They were at his beck and call.
 2          Now he just has a court-appointed lawyer,
 3   got no friends, limited family.  He is -- there's
 4   nothing for him except for a hope, a hope in
 5   sobriety that he can have.  It's been 40 months --
 6   39 months and two days today that he's been in
 7   custody in seven different institutions.
 8          On my watch, I've been to five.  And this
 9   is the first time I've actually been able to reach
10   next to him and touch him, because every time it's
11   been through a glass.  That's his life.  He used to
12   be able to be with, as you pointed out, partying and
13   going all over the world.  That's not who is sitting
14   here today.  He has only the hope in sobriety.
15          THE COURT:  Are any family members here?
16          MR. WILEY:  I think there's one.
17          THE COURT:  Oh, yes.  Thank you.
18          Are you his wife or something?
19          CAROLE FAULKNER:  No, ma'am.  His mother.
20          THE COURT:  Okay.  His mother.  Thank you
21   very much.  And what's your name.
22          CAROLE FAULKNER:  Carole Faulkner.
23          THE COURT:  Carole Faulkner.  Thank you
24   very much.  Go ahead.  You can be seated.
25          MR. WILEY:  And that's what we find, we
```

38

```
 1   find this.  And I don't mean to comment on it, but
 2   it's just the truth.  Mothers are the only ones in
 3   court, because everybody else has given up.
 4            I encourage my client not to give up on
 5   himself and to relish in sobriety and to go back to
 6   the -- to the morals that kept him for all those
 7   years, but he was a functioning addict for years.
 8   Many of us can't imagine that.  I don't know how to
 9   do it.  Most folks don't.  But I don't think it ever
10   has a happy ending.  And that's where we are today.
11            And I hope that the Court received my --
12   you acknowledged you received my sentencing
13   memorandum.  There is one thing during this
14   portion -- yeah, if I could, there is one thing, if
15   counsel would come up with me and I could approach.
16            THE COURT:  Yeah.
17            (Bench Conference SEALED; not a part of
18   this record:)
19            (SEALED Bench conference concluded.)
20            THE COURT:  Shawnie, to the extent we need
21   to, I'm going to seal that conference.
22            Go ahead, Mr. Wiley.
23            MR. WILEY:  Yes, ma'am.
24            After going through those things and being
25   lost in addiction, some of it is -- just most of the
```

```
 1    businessmen I know, they are very litigious, they
 2    just are, I mean, self-made people.  And I believe
 3    that that was his initial reaction when approached
 4    by the SEC, not realizing that you are dealing with
 5    the Government.  You are not going to win that.  And
 6    we see how that approach worked almost 40 months
 7    later.  Again, he's here in an orange jumpsuit.
 8    He's been in the SHU for the last two months.
 9              THE COURT:  Why?
10              MR. WILEY:  Had nothing to do with him.
11    But as they move and, in part, because of maybe
12    perhaps the situation we talked about that -- that
13    you're in a place that's -- where it's a hundred
14    degrees, has no air conditioning, no ability to
15    shower or limited ability to shower, no grooming.
16              When I first met him, his face didn't look
17    like that.  But he doesn't have anything.  And
18    although this is an incredibly high amount of money
19    and he did benefit from it tremendously, he's got
20    none of that.  None of that is left.  And you will
21    have to hear from him yourself.
22              But I know that those actions that we have
23    talked about, the actions against the Government,
24    the actions in trying to hide and conceal money, I
25    know that was not -- as the Court well knows, was
```

40

```
 1    not the right reaction.  But I -- I would -- I
 2    shouldn't say "wager," somebody told me to never say
 3    "wager."
 4              THE COURT:  You can say "wager" to me.
 5              MR. WILEY:  Okay.  But that's not the same
 6    person that's here today.  Thirty-nine months, it's
 7    the same as custody.  People tell you when to get
 8    up.  They tell you when to sit down.  They tell you
 9    when to eat.  The whole thing.  And he is
10    tremendously sorry for what -- for what he did.  And
11    he would ask for a sentence of -- of 120 months.  I
12    know the maximum is 180.  But I think there's
13    information -- and you have always been wise, and
14    you're going to judge him for yourself.  I've known
15    you for a long time.  I knew you back when I had
16    hair -- that you will be able to look at him and be
17    able to judge his sincerity and to weigh the factors
18    of 3553 and find a just punishment that protects the
19    community and that gives ample punishment but still
20    gives the word hope.
21              THE COURT:  Okay.  Thank you very much,
22    Mr. Wiley.
23              MR. WILEY:  Yes, ma'am.
24              THE COURT:  Mr. Faulkner, come on up here.
25    Let's hear from you.
```

1                    Go ahead.

2                    THE DEFENDANT:  Good morning, Your Honor.

3                    THE COURT:  Good morning.

4                    THE DEFENDANT:  To discuss how I got here

5      today, I just want to speak a minute about my past.

6      Thirty years ago, I started my first business --

7      I've got a scratchy throat, sorry, from allergies.

8                    THE COURT:  Thirty years ago.  How old

9      were you?

10                   THE DEFENDANT:  Fifteen years old.

11                   THE COURT:  You were 42 when you were

12     arrested.  How old are you now?

13                   THE DEFENDANT:  I'm 45 on December the

14     6th.

15                   I started my first company when I was 15.

16     Subsequently I've started approximately 50 companies

17     over the course of these three decades.

18                   Each one of those companies I -- I -- I

19     built the same way, a lot of hard work, starting

20     from scratch, and surrounding myself with smarter

21     people than myself, people who knew their bailiwick

22     and their expertise.

23                   It worked well for me up until those same

24     people in Breitling we used, the best securities

25     lawyers, accountants, auditors, compliance people,

```
 1    and for some period of time, you know, I took their
 2    advice, I heeded their advice.
 3              But at some point, if life is -- if -- if
 4    life is a tree of choices and the branches are the
 5    choices and the decisions we make, I grabbed onto
 6    the wrong branch, and I found myself in a dark spot,
 7    in a dark hole, in the throes of addiction.  I was
 8    using cocaine and Adderall, large amounts of
 9    alcohol, opioids, for approximately ten years.  And
10    I thought I was a functioning addict, to use
11    Mr. Wiley's term, but the reality is that I was not.
12              And so we were padding -- if you want to
13    use the word padding -- or increasing the cost
14    structure of each one of our drilling deals.  And I
15    was utilizing a portion of that money to support an
16    addiction of alcohol and narcotics.
17              And I found myself in that deep, deep
18    hole, and I had no way, I guess, to get out.  I
19    thought I was managing it, or I thought I was
20    maintaining it.  I think when you're in the throes
21    of addiction, you feel that, you know, your ego and
22    you can handle whatever.  But the reality is that I
23    was crippled from that.
24              And I didn't realizes how bad it was until
25    I met Ronald Leazer (phonetic) and James Bridges
```

43

```
 1    from the FBI and the IRS in Los Angeles, and they
 2    arrested me.  And they put me in a beach -- a
 3    Manhattan beach jail overnight.  And the next
 4    morning they came to transport me to the
 5    Metropolitan Detention Center in Los Angeles.
 6              In the morning, when I got in the car,
 7    James Bridges from the FBI got in the back seat next
 8    to me and asked me, "How are you feeling?  Are you
 9    okay this morning?  Are you going through any kind
10    of withdrawals?"  And until that moment, I didn't
11    really know that everyone knew of my addiction, and
12    it sort of took me aback when he said that.
13              I went through a detox and withdrawals in
14    the Los Angeles Detention Center 39 months ago,
15    roughly, and two days.  It was rough.  And I -- I
16    really took his question, if you will, to heart.
17              And for the last 39 months, I have
18    maintained a clean and sober sobriety life.  And
19    even going to AA classes at Dallas County Jail when
20    I went through there, they offered them -- other
21    places don't really offer them, but they offered
22    literature that I could can read up on.  And I don't
23    need to tell you, Your Honor, that there are drugs
24    and alcohol available in jail.
25              THE COURT:  Oh, yeah.
```

 1            THE DEFENDANT:  Okay, so -- if you want

 2   them.  But that's my best asset today is sobriety,

 3   and I don't take it lightly.

 4            So standing here before Your Honor this

 5   morning, I take full responsibility for my actions

 6   and the actions that led to these crimes being

 7   committed against our investors.  And my lying and

 8   manipulation and poor judgment is really what led to

 9   the destruction of the company and my

10   self-destruction, as well.

11            So I want to make that clear, that I take

12   full responsibility for that.  So as I stand here at

13   my darkest day and my darkest hour before you, I am

14   ready, willing and able to accept the punishment

15   that you deem necessary.

16            And being locked up gives you a lot of

17   time to think about stuff.  And also being sober

18   gives you a lot of time to think about stuff

19   clearly, with a sober mind and good judgment.

20            I have thoughts about mortality.  I am 45

21   years old now in a few months.  And looking back at

22   the time I wasted and the time I threw away to drugs

23   and alcohol, those are times I can't get back.  I

24   can't get back those days, months and years that I

25   tossed away.  But I do think about my life going

1    forward, a much simpler life.

2         This chapter of my life is over.  You are

3    fixing to write the ending today.  You are fixing to

4    send me on a journey.  And once I get done with that

5    journey and get back out into the free world, I'm

6    going to take it one step at a time.  I'm going to

7    protect my biggest asset, which is my sobriety.  And

8    anyone I surround myself with in the future won't be

9    an enabler, an enabler of drugs or alcohol, they

10   will be a supporter of what I have accomplished in

11   these last 39 months, not wasting those months but

12   really working hard.

13        It wasn't easy, Your Honor.  The first

14   year I really felt like my mind was still foggy.

15   The impact from drugs and alcohol, it wasn't just

16   where it goes away when you stop.  It lingers for

17   some period of time.  It's hard to explain.  It just

18   really -- it really handicapped my mind and my

19   system.

20        THE COURT:  But -- but, you know, you say

21   you were on drugs.  But, my God, you did -- you

22   know, you have Breitling Oil and Gas, you have Crude

23   Energy, you have Patriot Energy, and it goes on and

24   on.  And, you know, it -- I think BOG, BEC, Crude

25   and Patriot.  How did you do all that being high on

1  drugs?

2          THE DEFENDANT:  Well, Your Honor, I think

3  that when you become a functioning addict, in the

4  morning, you know, you take Adderall to get up in

5  the mornings, and in the evenings you take Xanax to

6  go down to sleep.  Friday through the weekend

7  becomes party central.  Friday at some points become

8  Thursday and Friday, Thursday, Friday, Saturday and

9  Sunday becomes Monday sometimes.

10          And in the business, Breitling and the

11  subsequent companies, there was a mentality of work

12  hard/play hard.  It wasn't just myself in the throes

13  of addiction.  It ran through my business partners

14  and the folks in the sales department, et cetera.

15          I'm not here to speak about them poorly or

16  positively, I'm speaking about myself.  And so I

17  think that functioning addict and functioning

18  alcoholic, I guess it was something that I mastered,

19  I suppose, I don't know.  But I can tell you that

20  it -- it got bad over the course of those years, and

21  it was -- it was pretty bad.

22          THE COURT:  And you made it -- you were

23  going to take off to Lebanon or something, weren't

24  you?

25          THE DEFENDANT:  I was not taking off to

1  Lebanon.  I was taking off to London.  I had a

2  return ticket.

3          THE COURT:  Right.

4          THE DEFENDANT:  And then -- and I really

5  think that that interaction with James and Ronnie

6  and more so --

7          THE COURT:  James and Ronnie who?

8          THE DEFENDANT:  I'm sorry, Ronnie Leazer

9  from the IRS and James Bridges from the FBI.  It was

10  really a pivotal point in my life.  And I really

11  think standing here today, I am not taking it

12  lightly, they probably saved my life and allowed me

13  to have another chapter, because I was spiraling out

14  of control.  So I don't envy the decision you're

15  making today, but I do respect it.

16          And lastly, the most important, I want to

17  apologize -- and I'm very remorseful and I'm very,

18  very sorry -- for the impact my actions had to our

19  victims, their families, our employees and even the

20  community.

21          THE COURT:  But you know, they had some --

22  you know, they had some pretty severe victims.  I

23  mean, I'm just going to give you some examples.

24          PM, whoever that is, invested $125,000,

25  and he was -- said, "I hope there was a special

```
 1   place in hell for people like Christopher Faulkner."
 2             And Ms. SR, Circle Anchor said she was a
 3   farmer and made the investment into the defendant's
 4   company in order to retire early; now she can't
 5   retire early.
 6             I mean, it just goes on and on and on.
 7   See these were not necessarily rich people.
 8             THE DEFENDANT:  Well, our investors, to my
 9   knowledge, were all accredited.  So I'm not saying
10   that's rich or poor, but they have a sophistication
11   and understanding.  But I'm not here to -- I'm not
12   here to try to make excuses for or to lighten the
13   load or the impact.
14             My behavior was abhorrent.  And that I can
15   see clearly today.  Thirty-nine months ago I
16   probably wouldn't have had the courage to stand
17   before you and say the things I'm saying, but
18   that's -- that's really what I wanted to say this
19   morning, Your Honor.
20             THE COURT:  Thank you very much,
21   Mr. Faulkner.
22             You-all can sit down, and I want to hear
23   from the Government.
24             And if you want to call your victim first.
25             MR. BUSCH:  Yes, Your Honor.
```

```
 1              The Government would call Ms. Dyer, Lois
 2   Penny Dyer, D-Y-E-R.
 3              MS. DYER:  Do I need the mask?
 4              THE COURT:  No, no.  Come up here, and I'm
 5   going to put you on the witness stand so we can all
 6   hear you.  Just right up here.
 7              MS. DYER:  Okay, Judge.
 8              THE COURT:  Okay.  Go ahead and speak into
 9   the microphone and state your name for the record.
10              MS. DYER:  Okay.  Thank you, Your Honor.
11              THE COURT:  You've got to speak into it.
12              MS. DYER:  Okay.  My name is Lois, but I
13   go by Penny Dyer.
14              THE COURT:  Do you want to ask her
15   questions, Mr. Busch?
16              MR. BUSCH:  Your Honor, I thought that the
17   witness simply had a statement to give to the Court.
18              THE COURT:  Yes, absolutely.  Go ahead.
19              MS. DYER:  Yeah, I do.  I do.
20              THE COURT:  And if you're going to read
21   it, read it slowly.  Okay?
22              MS. DYER:  I will probably be reading it
23   and not reading it.
24              THE COURT:  Okay.
25              MS. DYER:  I want to address this to you,
```

50

```
 1   Chris.  I want to talk to you like a mother.  I'm
 2   glad to see to your mom in the courtroom today.
 3            My husband, Mike and I, are Christians.
 4   And God has blessed us with a very successful
 5   mini-storage business.  Mike worked faithfully in
 6   that for decades to build up our family business.
 7            And when we sold all our properties, he
 8   tried to make the best reinvestment decisions.  And
 9   I remember exactly the day that we sat in your
10   office, met you and decided to trust you to invest a
11   huge portion of the profits from the sale of those
12   warehouses into your oil deals.
13            Now, we know that everything we have
14   really belongs to God and that we, you know, are
15   only stewards of what he has entrusted us with for a
16   time.  So, Chris, you really didn't steal $750,000
17   plus all future earnings from us, you robbed God.
18   And really, you owe him a debt you can never repay.
19   I want you to let that sink in just a second.
20            Of course, you know, what you stole and
21   squandered on things, I won't mention, has greatly
22   affected our family's income, our estate and our
23   donation abilities.
24            Because, you see, as Christians, it is our
25   joy to give to missionaries and to organizations
```

```
 1    that further the gospel.

 2              And this is where it hurt me the most, is

 3    that we were also sending all of our precious

 4    grandkids to Christian schools.  We were providing a

 5    Christian education for them.  And because of what

 6    you did, that's no longer possible.  And it broke

 7    our hearts and it broke their hearts when we had to

 8    take them out of their school away from their

 9    teachers and all of their friends.

10              So, Chris, nobody ever stands alone.  It

11    always affects others, many others in this case.

12    And I'm guessing that, like me, you would agree that

13    your choices have taken you farther than you ever

14    intended to go, kept you longer than you ever

15    intended to stay, and cost you far more than you

16    ever intended to pay.

17              And so now here you sit in this court

18    guilty and awaiting your sentence before this

19    Honorable Court.

20              But -- and surely this was never your

21    dream destiny, nor that of your mom's for you.  I

22    have a son and a daughter that are in your age

23    group.

24              But as a mother, I'm going to tell you

25    that it's only going to get worse for you from here,
```

1    because some day, unless you do repent -- and it

2    sounds like you have made some steps toward that --

3    you're going to stand before the Chief-Justice of

4    the Supreme Court of the entire Universe, and you're

5    going to have to give an account, and the evidence

6    against you is overwhelming.

7              And you will be found guilty, and you will

8    be punished for eternity for this crime and for

9    every other sin as well.

10             But our family does not have to worry

11   about getting justice or reparation from you ever,

12   because either Jesus will save you and redeem you

13   and then our offense against you will be absorbed

14   into the cross of Christ, or God will justly and

15   righteously judge you for your actions against us.

16             So, Chris, today is a really good day for

17   our family, because we are trusting our future to

18   the goodness and the justice of God and the love of

19   God, I might add.

20             Therefore, I'm going to look you in the

21   eye, and I'm going to say that I forgive you, and I

22   release you from the expectation that you are ever

23   going to be able to fix this for us.

24             And so today -- and I have some of my --

25   my husband, my daughter, my son-in-law, my son and

53

```
 1    daughter-in-law were not able to be here.  Today
 2    we're choosing to move forward in the freedom of
 3    forgiveness.
 4              But, Chris, you know, this could be a
 5    really good day for you, too.  In fact, this could
 6    be the very best day of your whole life, but it will
 7    be your choice.  Of course this choice cannot
 8    commute your federal sentence, but it will keep you
 9    from serving an eternal sentence.
10              So right now, right now in the quietness
11    of your own heart, if you will admit that you are a
12    sinner and that your sin deserves to be punished and
13    believe that Christ died on the cross for you and
14    took your punishment, every bit of it, and rose from
15    the dead, and if you will put your trust in Jesus
16    Christ alone as your savior, you will be saved.  And
17    Chris, if you trust him, I promise you that you will
18    never be disappointed.
19              And whenever those prison doors slam
20    behind you, you will still be free in Christ, which
21    is the only kind of freedom that really ever matters
22    for any of us.
23              The scripture says that "Today is the day
24    of salvation."
25              You know, the Lord always promises
```

54

```
 1   forgiveness for our repentance, but he never
 2   promises tomorrow for our procrastination.  So you
 3   may hear the gospel again in prison.  You might have
 4   already heard it since you've been incarcerated.
 5   There very well may be a next time for you, but
 6   there will always come a last time.
 7           So my prayer for you today is that God
 8   will have mercy on your soul and that he will bless
 9   you with the gift of true repentance, because only
10   you know your own heart and only God does, and I
11   pray that it will be today.
12           Thank you, Judge.
13           THE COURT:  Thank you very much.  You may
14   step down.
15           Mr. Busch.
16           MR. BUSCH:  Yes, Your Honor.
17           Thank you, Your Honor.
18           THE COURT:  Sure.
19           MR. BUSCH:  On behalf of the Government,
20   I'm going to keep my remarks brief.  There's nothing
21   I can say that is more profoundly moving than what
22   this victim just spoke to the Court.
23           THE COURT:  I think so, too.
24           MR. BUSCH:  And in this case, there were
25   800 investors --
```

55

```
 1              THE COURT:  I know.
 2              MR. BUSCH:  -- that were swindled by this
 3    man.
 4              THE COURT:  Over how many years, five
 5    years?  Six years?
 6              MR. BUSCH:  Yes, Your Honor, tens of
 7    millions of dollars.  And it wasn't simply that this
 8    defendant had good intentions in starting his
 9    business, that's irrelevant; that this defendant
10    hired experts to advise him on the law on SEC
11    regulations, experts on oil and gas.  This defendant
12    lied to the investors from the very beginning.  He
13    said he was educated, he was degreed, that he was
14    experienced in these matters, all of that was a lie.
15              He oversold these interests.  He knew
16    exactly what he was doing every step of the way.
17              THE COURT:  Oversold them, in other words
18    offered more leases than were available or something
19    like that?
20              MR. BUSCH:  Yes, Your Honor, more working
21    interest, more working units than were available.
22    He inflated -- he took the inflated geology reports
23    from the geologist and inflated them even more so.
24              The words egregious, grievous, outrageous,
25    are inadequate to describe the conduct in this case.
```

56

1    I don't have a word that describes it.

2              I think Ms. Dyer spoke from the heart, not

3    about herself and her husband and her family and the

4    children, but all the other investors in this case.

5              And for this defendant today to say, well,

6    as some sort of an excuse he believed all the

7    investors were accredited, as if that somehow

8    ameliorates or lessens the impact of the fraud he

9    committed.  This defendant and his wife in one year

10   alone spent almost $7 million on American Express

11   bills.  All investor money.  Money that belonged to

12   good, decent people in this country.  People that

13   believed in this man, believed in the lies that he

14   told them.

15             There is simply no measure that can

16   adequately compensate these victims in this case.

17             And I -- and I -- my admiration and

18   respect for Ms. Dyer in saying that she has

19   personally forgave him for his conduct goes to the

20   strength of the good and decent people of this

21   country; the people that he victimized and that he

22   lived this lavish and outrageous lifestyle

23   supporting over $23 million of investor money that

24   he used to support his own lifestyle.

25             Now, I will give him credit that after he

```
 1   was arrested, before too long, he reached an
 2   agreement with the Government and agreed to plead
 3   guilty, and he hasn't wavered in that desire to
 4   plead.
 5             THE COURT:  But you had to deal with him.
 6   I mean, you had to deal -- you couldn't just give
 7   him a certain amount, you had to deal with him.  And
 8   first you agreed to, what, 140 months or --
 9             MR. BUSCH:  I think that's correct, Your
10   Honor.  It was a 12-year sentence.
11             THE COURT:  Yeah, I mean, so you still had
12   to deal with him, right?
13             MR. BUSCH:  It was a tremendous amount of
14   effort that went into the investigation before the
15   arrest and after the arrest, that's correct.
16             There really was no place for Mr. Faulkner
17   to run and hide.  And I believe Mr. Faulkner
18   realized that and agreed to plead guilty.
19             And we had the original deal that the
20   Court did not approve.  And so we have this
21   agreement, and that is the plea to three five-year
22   counts, the two securities fraud and the tax
23   evasion.  I haven't even mentioned the tax evasion.
24             The one year of that particular charge,
25   the income was over four and a half million, and he
```

58

```
 1   simply failed to file a tax return, failed to pay
 2   anything to the United States, failed to assume that
 3   rightful role in society that we all expect of
 4   ourselves to pay taxes, especially a man who
 5   stripped this corporation of investor money to live
 6   this lavish -- this insanely grotesque lifestyle.
 7            I don't see on behalf of the Government
 8   any reason for the Court to depart below the
 9   guideline range of 180 months in this case, and that
10   would be 15 years.  I know that the Government had
11   agreed in the past to 12, but the Court rejected
12   that.  And I don't -- that agreement is gone.  We
13   have reached a new agreement, new three-year counts.
14   And I don't frankly see any reason to depart from
15   the 180 months under the facts and circumstances of
16   this case.
17            Again, I -- I don't have words to describe
18   the conduct.  Many times we look at these cases in
19   this sterile environment of the courtroom and we
20   don't feel the pain of the victims, especially in a
21   case where there's -- there's a plea and there's no
22   trial.  But Ms. Dyer brought it home for all of us.
23            THE COURT:  I can see the pain.
24            MR. BUSCH:  We will never forget why we
25   are here and what we do.
```

59

```
 1              So Your Honor, on behalf of the
 2    Government, I would ask that the sentence not be
 3    less under any circumstances than 12 years.
 4              THE COURT:  Fifteen years.
 5              MR. BUSCH:  Oh, I don't see any reason for
 6    the Court to depart below the guidelines of a
 7    15-year sentence.
 8              THE COURT:  Thank you very much,
 9    Mr. Busch.
10              Come on back up here Mr. Wiley and
11    Mr. Faulkner.
12              Mr. Wiley, I want to give you a chance to
13    say anything else you would like to say.  I mean, I
14    think you have covered it, but go ahead.
15              MR. WILEY:  I think that I have.  But I
16    did want to thank Ms. Dyer for being here and for
17    having a wonderful family and a wonderful spirit.
18              THE COURT:  Was Ms. Dyer involved in this
19    at all?  Was she involved in this?
20              MR. WILEY:  You mean as far as --
21              THE COURT:  In the fraud?  No, no, you
22    don't have to answer that.  It's awkward, so we
23    won't answer that.
24              MR. WILEY:  No, I was saying the nice lady
25    that spoke before the Court a little while ago.
```

```
 1                THE COURT:  Oh, yes.
 2                MR. WILEY:  I said Ms. Dyer.
 3                THE COURT:  Okay.
 4                MR. WILEY:  In truth, she did sum that up,
 5      and I'm not going to take any issue with anything
 6      that she said.
 7                THE COURT:  Okay.
 8                MR. WILEY:  Because of the amount of time
 9      that's already been spent, because of the COVID,
10      because of -- which is like dog years.  It's
11      different than what it was ten years ago, what it is
12      right now, spending time in the seven different
13      institutions, being moved nine times, it is
14      egregious.  I'm -- I'm the same way about -- about
15      what happened and the amount of money.  I do believe
16      what we said earlier, that he didn't grow up to be
17      this way.  This wasn't supposed to be, but that's
18      what happens when you dance with the devil, it just
19      is.
20                THE COURT:  Yeah.
21                MR. WILEY:  But to add more time than is
22      necessary, the max, I know that they negotiated a
23      good deal before I ever came on the scene, because,
24      again, I'm the third lawyer in this case --
25                THE COURT:  Yeah.
```

 1          MR. WILEY:  -- that it does not add

 2    anything that last year.  It doesn't add any more to

 3    the remorse that he has, any more to the

 4    rehabilitation that he has, any more to the

 5    punishment than just it's another year.  I think

 6    that -- that he's trying to get help.  That's the

 7    reason why we were asking the Court for Lompoc and

 8    for the RDP so that he can continue.  Because it's

 9    always interesting when people are here now and when

10    they are in a sober mind, they can talk about what

11    they want to do and what their plans are.  But if

12    they don't get support doing the rest of their time

13    after their sentence and after they get out of

14    custody -- which I know he will be on supervised

15    release.  But what the Court says here today is

16    important as to how he's treated going -- going

17    forward and the ability to rehabilitate.  I don't

18    think that he's ever going to have the ability to

19    pay back that money.

20          THE COURT:  Right.

21          MR. WILEY:  It's flying too close to the

22    sun.  I mean, your wings are gone.  You are not

23    going to rise again in all likelihood, but you can

24    rise to be a normal, respectable human being that,

25    when their lips are moving, they are not lying.

1          THE COURT:  Okay.  Thank you, Mr. Wiley.

2          Anything else, Mr. Faulkner?

3          THE DEFENDANT:  I think I said it earlier,

4    Your Honor.

5          THE COURT:  Okay.  Go ahead.

6          THE DEFENDANT:  I said it earlier.  Thank

7    you.

8          THE COURT:  All right.  You know, I agree

9    with Mr. Busch.  It's difficult to find the words to

10   describe this case, the fraud involved.  It was just

11   so widespread.  I think it was searing, if you will.

12   It was diabolical, if you will.  I mean, I don't

13   think I have the adjective either.

14          But, you know, just talking about some of

15   the victims, you know, a married couple invested

16   $258,000 with the intent to provide for their

17   daughter and grandson upon their passing.  They

18   received no compensation from any source.  And so

19   they had less financial stability, severely

20   restricted spending, elimination of vacations and

21   fretful days and reduced level of medical care and

22   an inability to assist their grandson's college

23   education.

24          Again, I said, "There's a special place in

25   hell," by Mr. PM who said that, "for people like

63

1    Faulkner."

2          There is a guy, Mr. EF, of Fikis

3    Properties, reported your business is -- his

4    business is mostly lost now due to this horrible

5    fraud and has resulted in him working two jobs to

6    survive.  And he had a heart attack since learning

7    of the fraud as a result of high blood pressure,

8    stress and serious depression.  And he noted, "I

9    have lost all my happiness and zest for life."

10         Kussmaul Brothers revealed this offense

11   had caused a hardship to their farm.  As a result,

12   they are living year to year.  They will not be able

13   to maintain the farm.

14         PM of PDM Holdings reported her husband

15   was a disabled veteran and would not be -- had not

16   been able to hold a job for many years.  PM expected

17   to work and support her family, however an illness

18   forced her to file for Social Security Disability.

19   And PM was dependent upon the income from the

20   investments to supplement her Social Security

21   benefits.  Well, she didn't get anything.

22         DR and SR reported they invested a large

23   part of their retirement.  As farmers, they only

24   have land as retirement.  Due to this offense,

25   there's no way for them to make up the money they

64

```
 1   have lost.  Eventually they will run out of money
 2   before the end years of their life.
 3            And you know, it just goes on and on.
 4   There's so many stories, personal stories.  And --
 5   and, you know, when I think about it, it's just not
 6   the end result.
 7            It's like Mr. Busch was saying, you had
 8   these people in your office.  You told them stories
 9   that weren't true.  And you took their money and you
10   didn't invest it, I mean, or you overinflated the
11   costs of things, and, you know, committed this
12   sophisticated fraud on everyone.
13            How did you -- I mean, I just am
14   astonished, because every once in a while -- I had a
15   50-million-dollar fraud a few years ago, but this
16   far exceeds that.  I was upset because the
17   Government only offered him a five-year cap, but
18   it's over.
19            Now I think the Government has come with a
20   more reasonable plea bargain.  And I will tell
21   everybody in the courtroom that, you know, I suppose
22   that this is a good thing to do.  I would really
23   like to see him get more, but we are limited by the
24   counts that the Government indicted him for.  And I
25   think it's probably fair, because we don't have to
```

```
 1    go to trial, we don't have to get all these people
 2    here, and it's probably a good resolution.
 3               But at the same time -- you know,
 4    Mr. Faulkner, I just don't think you're sorry.
 5    You're acting sorry, your mother is here, but I
 6    don't think you're sorry.  I really don't.
 7               How did you -- you know, you told these
 8    people this stuff about your background and your
 9    investment, and then you went on and -- and you
10    didn't -- and you took all the money and you -- and
11    you traveled and you did crazy things.  And you say
12    that's drugs, but, come on.  Come on.  Drugs?  I
13    mean, maybe you were on drugs, but that wasn't what
14    did this.  You are, I think, dishonest at heart, a
15    dishonest person.  And I hope that you can get the
16    grace of God like Mrs. Dyer said and change that.
17    But I think you are, in and of itself, an evil
18    person, and I'd like to see that change, but I think
19    you are.  And how else could you do this to all
20    these people?  I mean how else could you do it?
21               So, I mean, in my view, the proper
22    sentence is 60 months to run on each count
23    consecutively with each other, 1, 2 and 21.  And I
24    say that for all the 3553 factors:  Role in the
25    offense; amount of loss; the enormous amount of poor
```

66

```
 1   victims in this case, and all the other 3553 factors
 2   I'm not thinking about, but I'm -- I am thinking
 3   about but I'm not saying, you know, respect for law
 4   and -- and a deterrent effect for others.  And I
 5   think this is a deterrent effect.  I would like more
 6   time, but it's a deterrent effect with 180 months.
 7            So on counts -- and I would give you this
 8   amount, 180 months, whether all those enhancements
 9   were true or not, whether or not you obstructed
10   justice, whether or not you got acceptance of
11   responsibility, I would give you the same thing no
12   matter if any of the enhancements or any of the
13   points that you got were there or not.  So I want to
14   make sure I'm clear on that.
15            So a three-year term of supervised release
16   on Count 1, 2 and 21 to run concurrently with each
17   other.
18            I'm not going to give you a fine.
19            Restitution of 92,000 -- $92,427,296.37.
20            There's a 100-dollar mandatory special
21   assessment on each of the counts.
22            USPO:  Your Honor, I'm sorry.
23            The restitution I have is 92,446,376 --
24            THE COURT:  Okay.  I'm looking at the
25   presentence report.  Ninety-two thousand how much?
```

1          USPO:  $92,446,376.46.

2          THE COURT:  Okay.  That is what it is

3    then.  $92,446,376.46, right?

4          USPO:  Correct, Your Honor.

5          THE COURT:  Okay.  So it is the judgment

6    of the Court that the defendant, Christopher Aundre

7    Faulkner, is committed to the custody of the Federal

8    Bureau of Prisons for a period of 60 months on each

9    count of 1, 2 and 21 to run consecutively to one

10   another to an aggregated of 180 months.

11         Pursuant to the Preliminary Order of

12   Forfeiture, the defendant shall forfeit two large

13   custom oilfield paintings by Alec Monopoly -- this

14   is just the kind of example of the kinds of things

15   he purchased.

16         2013 Mercedes Benz AMG S63, VIN Number

17   WDDUG7JB2EA04976.

18         This is just unbelievable.

19         Third, a -- 2006 Bentley Continental, VIN

20   Number SCBBR53W96C037358; another extravagance.

21         Fourth, a 2012 Aston Martin Virage, VIN

22   Number SCFFDECNXCGG14069.

23         And a 2014 Land Rover HSE, VIN Number

24   SALGS2WF6EA162015.

25         Pursuant to the Mandatory Victim's

```
 1   Restitution Act in the amount of -- give it to me
 2   again.
 3              USPO:  $92,446,376.46.
 4              THE COURT:  -- is payable to the U.S.
 5   District Clerk, 1100 Commerce, Room 1452, Dallas,
 6   Texas  75242.
 7              Restitution shall be payable immediately,
 8   and any unpaid balance shall be payable during
 9   incarceration.
10              Restitution shall be dispersed to -- I'm
11   not going to mention each victim -- but they are
12   attached to the presentence report, correct?
13              USPO:  I don't believe they were attached
14   to the presentence report.  I believe it was just
15   the recommendation, Your Honor.
16              THE COURT:  Oh, okay.  Well, I think --
17   well --
18              MR. WILEY:  I think the addendum, Your
19   Honor.
20              THE COURT:  The addendum.
21              MR. WILEY:  Which was prepared by Seth,
22   yeah.
23              THE COURT:  Okay.  Addendum, yes.  The
24   victim list, I'm not going to read it all, but
25   you-all have the victim list.  It's on the -- in
```

1   fact, I'm going to make it part of the record.

2   Okay?  Will admit this as Court's Exhibit Number 1.

3           Okay.  If upon commencement of the term of

4   supervised release any part of the restitution

5   remains unpaid, the defendant shall make payments on

6   such unpaid balance in monthly installments of not

7   less than 10 percent of the defendant's gross

8   monthly income or at a rate of not less than $50 per

9   month, whichever is greater.

10          Payment shall begin no later than 60 days

11  after the defendant's release from confinement and

12  shall continue each month thereafter until the

13  balance is paid in full.

14          In addition, at least 50 percent of the

15  receipts received from gifts, tax returns,

16  inheritances, bonuses, lawsuit awards and any other

17  receipt of money shall be paid toward the unpaid

18  balance within 15 days of receipt.

19          This payment plan shall not affect the

20  ability of the U.S. to immediately collect payment

21  in full through garnishment, the Treasury Offset

22  Program, the Inmate Financial Responsibility

23  Program, the Federal Debt Collections Procedures Act

24  of 1990 or any other means available under federal

25  or state law.  Interest is waived under

70

```
1    18 U.S.C. Section 3612(f)(3).  No fine, but it's a
2    300-dollar mandatory special assessment.
3              And I adopt the terms of supervision set
4    forth in Miscellaneous Order Number 64, outlined in
5    part G of the presentence report except as modified
6    by any facts set forth in any addendum and any facts
7    found by the Court during sentencing.
8              The defendant shall comply with these
9    conditions during sentencing.
10             And I want to make sure that we have been
11   through those.  I want to recommend RDAP.  And what
12   was the other thing you wanted?
13             MR. WILEY:  RDAP in Lompoc, California.
14             THE COURT:  Okay.  Lompoc, California.
15             MR. WILEY:  Yes.  I actually played a
16   football game there once.  Dent on my head right
17   there.
18             THE COURT:  Okay.  I won't ask you about
19   that, Mr. Wiley.
20             We will try for Lompoc, California.
21             The terms of supervision are as follows:
22             You can't commit any new crime, federal
23   state or local.
24             You must not unlawfully possess a
25   controlled substance.
```

1          You must refrain from the use of a

2    controlled substance.

3          You must submit to one drug test within 15

4    days of release from imprisonment and at least two

5    periodic drug tests thereafter.

6          These are conditions of supervision when

7    you are released.

8          You must cooperate in the collection of

9    DNA.

10          You must make restitution in accordance

11   with 18 United States Code Section 2248, 2259, 2264,

12   2327, 3663, 3663(a) and 3664.

13          You must pay the assessment imposed in

14   18 United States Code Section 3013.

15          And you must pay any remaining balance of

16   restitution as set out in the judgment.

17          You shall refrain from incurring any new

18   credit charges or opening additional lines of credit

19   without approval of probation.

20          You shall provide probation complete

21   access to all business and personal information.

22          You shall not enter into any

23   self-employment while under supervision without

24   prior approval of probation.

25          You shall not be employed by, affiliated

```
 1    with, own or control or otherwise participate,
 2    directly or indirectly, in the business of oil and
 3    gas or other businesses or solicit money from
 4    investors without probation officer's approval.
 5              You shall participate in a program
 6    approved by probation for treatment of narcotic drug
 7    or alcohol dependency that will include:  Testing
 8    for the detection of substance use or abuse;
 9    abstaining from the use of alcohol during and after
10    completion of treatment; and contributing to the
11    costs of services rendered at a rate of $25 per
12    month.
13              Okay.  Mr. Faulkner, you can appeal this
14    sentence.  Mr. Wiley can do that for you.  I will
15    probably do my judgment tomorrow or the next day.
16    And once I get my judgment out, you have two weeks
17    to file a notice of appeal.
18              So Mr. Wiley, you've got that --
19              MR. WILEY:  Yes.
20              THE COURT:  Will you talk to him about
21    appealing and make sure that notice is timely filed?
22              MR. WILEY:  I will.  There was one thing I
23    wanted to ask the Court -- and thank you for the
24    other portions.  It is with respect to the
25    restitution, that some of that, I believe, is linked
```

```
 1   to the other case, i.e., that they are getting

 2   restitution in that case as well.  And if this

 3   judgment could mention the other case --

 4              THE COURT:  I'm not going to do that.

 5              MR. WILEY:  Okay.

 6              THE COURT:  I mean, it's too complicated

 7   to do that right here, right now.

 8              MR. WILEY:  Yeah.

 9              THE COURT:  So I will let you work that

10   out or them work it out, but I'm not going to do

11   that.  Okay?

12              MR. WILEY:  Yes, ma'am.

13              THE COURT:  Anything else from the

14   Government?

15              MR. BUSCH:  Yes, Your Honor.

16              At this time the Government would ask the

17   Court to dismiss the remaining counts of the

18   indictment, Counts 3 through 20.

19              THE COURT:  Three through 20.

20              MR. BUSCH:  Yes, ma'am.

21              THE COURT:  It will be so ordered.

22              Thank you-all for being here.  I

23   appreciate the victims being here very much.  You

24   know, it's been a long, hard road, but I think we

25   are finally there.  I just apologize about the
```

1    money.  I apologize about the money.

2              All right.  We will be in recess.  Thank

3    you.

4              (court in recess at 11:32 a.m.)

```
 1                    C E R T I F I C A T E

 2            I, Shawnie Archuleta, CCR/CRR, certify

 3    that the foregoing is a transcript from the record

 4    of the proceedings in the foregoing entitled matter.

 5            I further certify that the transcript fees

 6    format comply with those prescribed by the Court and

 7    the Judicial Conference of the United States.

 8            This 12th day of January 2022.

 9

10

11                      s/Shawnie Archuleta
                        Shawnie Archuleta CCR No. 7533
12                      Official Court Reporter
                        The Northern District of Texas
13                      Dallas Division

14

15

16    My CSR license expires:  December 31, 2022

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25
```